1

CA#
194-09
Copy

1    SUPREME COURT OF THE STATE OF NEW YORK
     COUNTY OF QUEENS:  CRIMINAL TERM, PART K-12
2    ----------------------------------------X
     THE PEOPLE OF THE STATE OF NEW YORK,
3                               Ind. No.   1820/08

4              -against-           HEARING

5    RICHARD COLLINS,

6                     Defendant.
     ----------------------------------------X
7
                              February 26, 2009
8                             Queens Supreme Court
                              125-01 Queens Boulevard
9                             Kew Gardens, New York 11415

10   B E F O R E :
                              JOSEPH GROSSO,
11                            Justice, Supreme Court

12

13   A P P E A R A N C E S :

14   For the People:

15   THE HONORABLE RICHARD A. BROWN,
     District Attorney, Queens County
16
     BY: ROSEMARY CHAO, ESQ.
17       Assistant District Attorney

18

19   For the Defendant:

     PATRICK JEROME BRACKLEY, ESQ.
20

21

22

23

24                            DONNA CONTI,
                              SENIOR COURT REPORTER

25

                      dc

Proceedings                                    2

1              THE CLERK:  This is number 17 on the

2    calendar, Indictment No. 1820 of 2008, Richard

3    Collins, incarcerated and produced.  Mr. Collins is

4    on his way out.

5              THE COURT:  Thank you very much.

6              Counsel, good afternoon.

7              MR. BRACKLEY:  Good afternoon, Judge.

8              MS. CHAO:  Good afternoon.

9              THE COURT:  Mr. Brackley and Ms. Chao are

10   present in the Court.

11             THE COURT OFFICER:  Coming out.

12             (Whereupon, the defendant is produced and

13   present before the court:)

14             THE CLERK:  Sir, are you Richard Collins?

15             THE DEFENDANT:  Yes.

16             THE CLERK:  Thank you.

17             MR. BRACKLEY:  Patrick Brackley for Richard

18   Collins.

19             MS. CHAO:  Rosemary Chao for the People.

20             THE COURT:  Okay.  The case is on today for

21   a Dunaway/Wade hearing.

22             Are both sides ready to go forward?

23             MS. CHAO:  Yes, your Honor.

24             MR. BRACKLEY:  Ready, Judge.

25             THE COURT:  Thank you very much.

dc

Proceedings                                3

1            All right.  Sit back.  Relax.

2            Ms. Chao has handed up a list of Rosario

3    materials that were handed over to the defense.

4            Mr. Brackley, do you acknowledge receipt?

5    Have you had time to review the documents that have

6    been handed over to you pursuant to Rosario?

7            MR. BRACKLEY:  Yes.  I acknowledge receipt

8    by signature.  I have the items and I'm prepared to

9    go forward.

10           THE COURT:  Great.  Thank you.

11           Before testimony is taken, is there any

12   offer by the People?

13           MS. CHAO:  Judge, the defendant is a

14   violent predicate.  The minimum is ten years.

15           I don't believe the defendant is interested

16   in any sort of double digits, so there's no sort of

17   disposition.

18           MR. BRACKLEY:  It's a very generous offer,

19   but at this time it's declined.

20           THE COURT:  Terrific.

21           Call your witness.

22           MS. CHAO:  Your Honor, just for the record,

23   there were six color photos taken of the line-up by

24   the District Attorney's Office, so, therefore, I

25   provided those photos to Mr. Brackley.  I just

Proceedings                          4

1     received those today.

2                 A Mapp hearing was requested, but it was

3     denied, so it is only going to be a Dunaway/Wade.

4                 THE COURT:   It is Dunaway/Wade portion of

5     this but the decision by Judge Knopf is specific.   He

6     says abandoned property.   He made the ruling on the

7     papers.   That's his prerogative.   I can't change it.

8                 MS. CHAO:   That's correct, Judge.

9                 So, at this point the People call Detective

10    Joseph Faivus to the stand.

11                MR. BRACKLEY:   For the record, I do not

12    believe there was any property taken from the

13    defendant in any event, so I don't think that was a

14    correct decision.

15                THE COURT:   Okay.

16                MS. CHAO:   Judge, property was recovered in

17    this case belonging to the defendant, but it wasn't

18    taken from the defendant.   It was, in fact, abandoned

19    at the incident location.

20                THE COURT:   Wonderful.   Wonderful.   Let's

21    get going.

22                THE COURT OFFICER:   The witness is

23    entering.

24                (Whereupon, the witness entered the

25    courtroom and the following occurred:)

                             dc

Proceedings                                      5

```
 1                    THE COURT OFFICER:  Face the clerk, sir.

 2         Raise your right hand.

 3    J O S E P H     F A I V U S,

 4    a Detective, called as a witness on behalf of the People,

 5    after having been first duly sworn and having stated his

 6    shield number as 1848 and his command as the 114th

 7    Detective Squad, New York City Police Department, took the

 8    witness stand and testified as follows:

 9                    THE WITNESS:    I do.

10                    THE CLERK:  Please have a seat.

11                    THE COURT OFFICER:  People call witness

12         Detective Joseph Faivus, F-A-I-V-U-S, Shield No. 1848

13         of the 114th Precinct Detective Squad, New York City

14         Police Department.

15                    THE COURT:  Thank you, sir.

16                    Detective, good afternoon.

17                    THE WITNESS:  Good afternoon.

18                    THE COURT:  Thank you very much for your

19         courtesy in coming in.

20                    THE WITNESS:  Thanks.

21                    THE COURT:  Ms. Chao, we have a podium.  If

22         you would like to use the podium or wherever you are

23         most comfortable setting up.

24                    You may inquire.

25                    MS. CHAO:  Thank you.
```

dc

1    DIRECT EXAMINATION

2    BY MS. CHAO:

3         Q    Detective Faivus, how long have you been

4    employed by the New York, City Police Department?

5         A    Roughly 13 and a half years.

6         Q    Of those 13 and a half years, approximately how

7    long have you been a detective for?

8         A    Excuse me?

9         Q    How long have you been a detective for?

10        A    Three.

11        Q    And what command are you currently assigned to?

12        A    114th Squad.

13        Q    And approximately how long have you been at the

14   114th Precinct?

15        A    Twelve and a half years.

16        Q    Now, directing your attention to December 13 of

17   2007, were you working that day?

18        A    Yes, I was.

19        Q    What was your assignment?

20        A    114 Ram.

21        Q    And on that date did you receive an assignment

22   in connection with this case?

23        A    Yes, I did.

24        Q    And can you tell the Court what that assignment

25   was?

Det. Faivus - People - Direct                    7

1      A     Approximately 4:30 a.m. on 12/13 at 21-02

2   Broadway inside of a White Castle there was a robbery at

3   gunpoint.

4      Q     And is that White Castles located in Queens

5   County?

6      A     Yes, it is.

7      Q     Were there any civilian witnesses pertaining to

8   that robbery?

9      A     Yes, there was.

10     Q     And what are the names of the civilian

11  witnesses?

12           THE WITNESS:  If you don't mind, I would

13     like to --

14           THE COURT:  You need to refresh your

15     recollection?

16           THE WITNESS:  Yes, please.

17           THE COURT:  All right.  Just let counsel

18     know what document you're looking at .

19           THE WITNESS:  I'm looking at the index

20     sheet for my DD5.

21           MR. BRACKLEY:  Thank you, Judge.

22     A     Corinthian Brown, Perickoles Vasilaropoulos and

23  Anthony Englesbobb.

24     Q     Now, Detective, you testified that it was a

25  gunpoint robbery involving those complainants at the White

                              dc

 1   Castles?

 2       A    Yes.

 3       Q    And now directing your attention to June 15 of

 4   2007, did your investigation of that particular case --

 5                 THE COURT:   June 15th?

 6                 MS. CHAO:   I'm sorry, December 15th, 2007.

 7       Q    December 15th, 2007, approximately two days

 8   later, did your investigation of that case continue?

 9       A    Yes.

10       Q    And what did you do?

11       A    I responded to 21-02 Broadway and I received a

12   video disc of the video surveillance system inside the

13   White Castle.

14       Q    Did you view the video?

15       A    Yes, I did.

16       Q    Can you tell us briefly what you observed on the

17   video.

18       A    Approximately -- there's an image of a male, mid

19   to late 20s, about 6-foot, husky with a -- holding a

20   silver firearm.

21                 THE COURT:   I'm sorry, what was that last

22       thing you said?

23                 THE WITNESS:   Holding a silver firearm.

24                 THE COURT:   Thank you.

25       Q    What is the suspect doing with the silver

1    firearm?

2        A    It was in his hand produced.  He was holding it

3    in his hand.

4        Q    Was the suspect pointing the gun at anybody in

5    the White Castles?

6        A    At that time, no.  Not on the image, no.

7        Q    Did you observe the additional screens on the

8    video?

9        A    Yes.

10       Q    And can you tell us what you observed on the

11   screens, just generally?

12       A    The gentleman walked in, approaches the counter,

13   makes a purchase.  As he walks out he has a discussion

14   with three gentlemen sitting at a table.  After several

15   seconds a fight proceeds.  He runs out.

16           The same individual comes back, walks back

17   inside with a handgun in his hand, comes in, chases one of

18   the individual around the interior of the White Castle at

19   that time when he grabbed him and then he fled out a side

20   door.

21       Q    Did there come a time when you learned the names

22   of the three individuals depicted on the video?

23       A    Yes.

24       Q    And are those the three witnesses that you

25   testified about earlier?

                          dc

1      A     Yes, they are.

2      Q     Now, can you just describe the clothing

3   description of the suspect with the gun.

4      A     Black leather jacket with a pattern on the back,

5   hooded with a fur collar, dark shirt and dark -- looks

6   like dark jeans.

7      Q     Now, directing your attention to approximately

8   December 20th of 2007.

9            Did there come a time when you spoke to any

10  civilian witnesses in connection with this case?

11     A     Yes, there was.

12     Q     Who was that?

13     A     Mr. Englesbobb.

14     Q     You spoke to Mr. Englesbobb.

15           Did he tell you in sum and substance what you

16  had observed on the video?

17     A     Yes.

18     Q     And was Mr. Englesbobb able to provide a further

19  description?

20     A     The description was a male black, dark Hispanic,

21  approximately 6-foot, 180 to 200-pounds, in his late

22  twenties.

23     Q     Now, Detective Faivus, did there -- did there

24  come a time on June 26th of 2008 that you received a

25  notification in connection with this case?

1        A     Yes, there was.

2        Q     And can you tell us what that notification was

3     of?

4        A     It was a DNA positive hit.

5        Q     What was -- who was the suspect in the DNA

6     positive hit?

7        A     Richard Collins.

8        Q     Did was there a N.Y.S.I.D. number associated

9     with the DNA hit?

10       A     Yes, there was.

11       Q     And what was the N.Y.S.I.D. number?

12             If you don't know --

13             THE WITNESS:  May I look -- I would like to

14       look at my paperwork.

15             THE COURT:  Sure.  Go ahead.

16             (Whereupon, the witness peruses a document

17       and the following occurred:)

18       Q     Also, Detective, while you're reviewing your

19     paperwork, let us know if there was a particular incident

20     associates with the DNA hit.

21       A     The N.Y.S.I.is D. number 7960306 Michael.

22             And the complaint number stamp is 07 13174.

23       Q     What were the facts surrounding that complaint

24     number?

25       A     It was a robbery at 21-02 Broadway.

1    Q    Detective Faivus, the DNA hit, did you learn

2  where the DNA was retrieved from?

3    A    Yes.

4    Q    Where was it retrieved from?

5    A    From a White Castle bag.

6    Q    Did you observe on the video a bag possibly

7  fitting that description?

8    A    Yes.

9    Q    Who had the bag in the video?

10              THE COURT:  White Castle, there were White

11        Castle paper bags there.

12    Q    Who had the bag?

13    A    Mr. Collins.

14    Q    Now, Detective Faivus, upon receiving the DNA

15  hit, what did you do?

16    A    A computer check work-up on the suspect and

17  after that a Wanted Card was issued in his name.

18    Q    I direct your attention to the following day,

19  which is June 27th of 2008.

20              Were you working that day?

21    A    Yes, I was.

22    Q    And did you receive a notification from the

23  Warrant Squad?

24    A    Yes.

25    Q    And can you tell us the sum and substance what

1    that notification was of?

2        A    I received notification stating that the suspect

3    was put into custody.  He was going to be transported to

4    the 114th Precinct.

5        Q    When the suspect was transported to the

6    precinct -- withdrawn.

7             Detective Faivus, do you see the suspect that

8    was transported to the precinct on June 27th, 2008 here in

9    court today?

10       A    Yes, I do.

11       Q    Can you identify an article of clothing that

12   he's wearing.

13       A    Grey sweatshirt.

14            THE COURT:  Indicating Mr. Collins.

15            Go ahead.

16            MS. CHAO:  Thank you.

17       Q    Detective Faivus, upon the defendant arriving at

18   the precinct, did there come a time when you conducted an

19   identification procedure?

20       A    Yes, there was.

21       Q    What type of identification procedure?

22       A    Line-ups were done.

23       Q    And were there any civilian witnesses who viewed

24   the line-up?

25       A    Yes, there were.

1      Q      Which civilian witnesses?

2      A      Mr. Englesbobb, Mr. excuse me, I have to look

3   at it for the pronunciation.

4              (Whereupon, the witness peruses a document

5      and the following occurred:)

6      A      Perickoles Vasilaropoulos and Corinthian Brown.

7      Q      And can you just tell us, how did you notify the

8   complaining witnesses?

9      A      We responded to Mr. Englesbobb's apartment.  We

10   notified him, and then all three of them came in together.

11      Q      And when he arrived at the precinct, what did

12   you do?

13      A      When he arrived at the precinct, we had them

14   sitting in the waiting area at the front office until

15   everything was ready to conduct the line-ups.

16      Q      Now, Detective Faivus, when you had the three

17   complaining witnesses in a room, what did you say to the

18   complaining witnesses, if anything?

19      A      Basically just to sit here, be quiet and this

20   will be over with in about ten minutes.

21      Q      Where was the witnesses room in connection to

22   the holding cell?

23      A      The Witness Room was when you walk into the

24   office, it's all the way in the back isolated off from the

25   Interview Room.

Det. Faivus - People - Direct                    15

1        Q     Where was the defendant kept?

2        A     At that time he was -- we already transported

3   him into the Interview Room where we conduct our line-ups.

4        Q     Where is the Interview Room in connection with

5   the Witness Room?

6        A     Down the hall.

7        Q     Now, Detective Faivus, who viewed the line-up

8   first?

9        A     That was Mr. Brown.

10       Q     And approximately what time was that?

11       A     Sixteen -- around -- roughly around 1600 hours.

12             THE COURT:  That's 4 o'clock?

13             THE WITNESS:  Yes.  I'm sorry.

14             THE COURT:  It's one of the things I can't

15       do, one of many things I can't do.  I can't do

16       military time.

17             Thanks for the translation.

18       Q     Detective Faivus, is it fair to say it's between

19   4 to 4:30 p.m.?

20       A     Um-hum.

21       Q     Yes?

22       A     Yes.  I'm sorry.

23       Q     When Mr. Brown viewed the line-up, can you tell

24   us the circumstances surrounding that.

25       A     We bring him into a hallway with the one-way

dc

1    mirror.  It was A.D.A. Clark, my supervisor Sergeant Buehl

2    (ph,) myself.

3              At that time we lifted the panel where he can

4    view into the room and then we asked him several

5    questions.

6         Q    How many people were seated in the line-up?

7         A    Six.

8         Q    And who was in seat position number four?

9         A    Richard Collins.

10        Q    When Mr. Brown viewed the line-up, Detective,

11   did you ask him a couple of questions?

12        A    Yes, sir.

13        Q    What specifically did you ask him?

14        A    The first question I asked is, do you recognize

15   anybody?

16        Q    What did he respond?

17        A    Yes.

18        Q    And then what did you ask him?

19        A    Who do you recognize?

20        Q    And what did he respond?

21        A    Number four.

22        Q    And then what did you ask him after that?

23        A    We asked him where do you recognize him from?

24        Q    And what did he respond?

25        A    The White Castle.

1    Q    Now, after Mr. Brown viewed the line-up, where

2    was he transported to?

3    A    To a second office adjacent to where the other

4    two witnesses were being held.

5    Q    Is it fair to say it's a separate room from

6    where the initial Witness Room was?

7    A    Yes.

8    Q    And how close is the Witness Room to the room

9    after the complainants viewed the room?

10   A    Repeat the question.

11   Q    What's the -- how close is the Witness Room from

12   where they initially were kept to the other room where

13   they were led into after they made the viewing at the

14   line-up?

15   A    Right next to each other.

16   Q    And when Mr. Brown went into a separate room

17   from Mr. V.  And Mr. Englesbobb, was there anyone with

18   Mr. Brown?

19   A    There was a detective present.  I just can't

20   recall the name.

21   Q    What was the purpose of that detective being

22   present?

23   A    Just to keep the door closed, make sure no one

24   else spoke to him.

25   Q    And which civilian witness viewed the line-up

dc

1    next?

2        A    Mr. Vasilaropoulos.

3        Q    Can you tell us the circumstances surrounding

4    the line-up by Mr. Vasilaropoulos.

5        A    Brought him into the same hallway.  Sergeant

6    Buehl, A.D.A. Clark, myself, we opened up the pane of

7    glass, had him view it, and asked him three questions.

8            I asked him the first question, do you recognize

9    anybody?  The answer was yes.  What number do you

10   recognize?  Number four.  Where do you recognize him from?

11   The one in the White Castle.

12       Q    Where was Mr. Vasilaropoulos then brought after

13   he viewed the line-up?

14       A    He was brought into the same room where Mr.

15   Brown was.

16       Q    Again, was that officer present in that room

17   making sure the door was closed?

18       A    Yes.

19       Q    And then who viewed the line-up after

20   Mr. Vasilaropoulos and Mr. Brown?

21       A    Mr. Englesbobb.

22       Q    And can you tell us the circumstances

23   surrounding that.

24       A    He was brought from the room.  He was in the

25   same hallway, same Sergeant Buehl, myself and A.D.A.

1     Clark.  We lifted the pane of glass, had him view the

2     line-up, asked him the same three questions.  First, do

3     you recognize anybody?  The answer was yes.  Where do you

4     recognize -- I'm sorry -- which one do you recognize?

5     Number four.  Where do you recognize him from?  White

6     Castle.

7          Q    And, Detective Faivus, with respect to the

8     individuals in the line-up, can you give us an approximate

9     age range of the six individuals in the line-up?

10         A    Approximately late 20s to early 30s.

11         Q    How about approximate height?

12         A    Five ten to about six one, six two.

13         Q    What about the approximate weight?

14         A    170 pounds, maybe 220.

15              MS. CHAO:  Your Honor, I ask that People's

16         1-A and B be deemed marked for identification, 1-A

17         being the line-up depiction of 1 through 4 and 1-B

18         being the line-up depiction of 4 through 6.

19              THE COURT:  Want to show it to him?

20              THE COURT OFFICER:  (Complies.)

21              THE COURT:  I'll deem it marked for

22         identification as People's 1-A and B.

23              MR. BRACKLEY:  I would deem them in

24         evidence in the case.  I have no objection.

25              THE COURT:  Okay.  Without defense

                              dc

 1        objection, A and B now in evidence.

 2                    Thank you.

 3                    You don't have to say anything.

 4                    (Whereupon, the two items referred to were

 5        deemed marked in evidence as People's Exhibits 1-A

 6        and 1-B by the Court.)

 7                    THE COURT:   Thank you.

 8                    Okay.  Go ahead.

 9        Q    Detective Faivus, does People's 1-A and B in

10        evidence, does that fairly and accurately depict the

11        line-up at the times that the complainants viewed the

12        line-up?

13        A    Yes.

14        Q    And did there come a time where you took

15        official police action at the time you placed Mr. Collins

16        under arrest?

17        A    Yes.

18        Q    Did you obtain pedigree from Mr. Collins?

19        A    Yes, I did.

20        Q    Back in June of 2008, approximately what was his

21        age, approximately?

22        A    Approximately 28, 29.

23        Q    And how about height and weight?

24        A    About six one, about a little over 200-pounds.

25                    MS. CHAO:   Judge, I have no further

1        questions.

2                     THE COURT:  Is there any cross-examination,

3        sir?

4                     (Short pause.)

5                     MR. BRACKLEY:  Yes.  Sorry.  Yes, Judge.

6    CROSS-EXAMINATION

7    BY MR. BRACKLEY:

8        Q    Detective, you indicated you had an opportunity

9    to view a videotape that was obtained from the White

10   Castle; correct?

11       A    Yes.

12       Q    And you didn't -- you indicated to this Court at

13   a certain point you were able to observe some males who

14   were sitting at a table; correct?

15       A    Yes.

16       Q    Those were three particular males; is that

17   correct?

18       A    Yes.

19       Q    And were those males -- did they ultimately turn

20   out to be Mr. Brown, Mr. Vasilaropoulos and

21   Mr. Englesbobb?

22       A    Yes.

23       Q    So, in fact, those three individuals were

24   together in the videotape; is that correct?

25       A    Yes.

                              dc

1          Q      There comes a point where those three

2    individuals get into some altercation with the defendant

3    Collins that's on the videotape; correct?

4          A      Yes.

5          Q      And there comes a point where Mr. Collins

6    leaves, comes back, there's a further altercation and then

7    Collins leaves; correct?

8          A      Yes.

9          Q      Did you see Mr. Collins on that videotape take

10   anything from any of those people?

11         A      No.

12         Q      And that's the videotape that purportedly shows

13   this whole incident; right?

14         A      There's a part where he is unfortunately out of

15   view.

16         Q      Okay.  But you know he's down here on some

17   robbery case; correct?

18         A      Yes.

19         Q      Does that videotape show any robbery as far as

20   you are able to see?

21         A      No.

22         Q      Okay.  Now, then there comes a point when the

23   defendant leaves, you then do some police work, you get a

24   DNA match, and then Collins is ultimately arrested;

25   correct?

                              dc

1        A    Yes.

2        Q    Now, this line-up was conducted to see whether

3   or not any of these individuals can identify him; is that

4   correct?

5        A    Yes.

6        Q    And to your knowledge was any photo array ever

7   conducted?

8        A    No.

9        Q    And that would be that there was no opportunity

10  for either one of these three men to look at a computer

11  generated or anything like that; correct?

12       A    Right.

13       Q    When you obtained the identification of

14  Mr. Collins through the DNA, did you get a photograph and

15  at any time did you show it to any of these three

16  individuals?

17       A    No.

18       Q    Or any time in the investigation are you aware

19  if any of these three individuals were shown that

20  photograph?

21       A    No.

22       Q    During the line-up isn't it a fact that at some

23  point you were trying to -- these three individuals had

24  difficulty distinguishing number two from number four?

25       A    No.

1      Q     I'm going to show you --

2              MR. BRACKLEY:  If I could have it marked

3      Defendant's A for identification.

4      Q     Can you take a look at that?

5              THE COURT:  Defense A for identification,

6      I'll deem it.

7              (Whereupon, a document was deemed marked

8      for identification as Defendant's Exhibit A by the

9      Court.)

10     Q     That would relate to which complaining witness?

11             (Whereupon, the witness peruses a document

12     and the following occurred:)

13     A     Corinthian Brown.

14     Q     In fact, did you make a report of the results of

15     that line-up?

16     A     Yes.

17     Q     And, in fact, didn't you ask that individual,

18     does he recognize anybody, and he says number four;

19     correct?

20     A     Yes.

21     Q     And then didn't you ask that individual, where

22     do you recognize number two from, and he claims number two

23     is from the White Castle?

24     A     Yes.  That seems that's what the paper work

25     says, yes.

                              dc

1        Q     Why would that be?

2        A     Typographical.

3        Q     When you say "typographical", you had an

4    opportunity to review that; didn't you?

5              As a matter of fact, you wrote the original;

6    right?

7        A     This goes straight to the computer.

8        Q     But you were the one that wrote that; is that

9    correct?

10       A     Yes.

11       Q     And as a matter of fact, you put in number four.

12   You put in number four.  You're asking him, where do you

13   recognize number two from?

14       A     That is right.

15       Q     And it's number two he claims comes from the

16   White Castle; right?

17       A     Right.

18       Q     And I believe that would be consistent,

19   Detective, with each and every one of these.

20             MR. BRACKLEY:  I'd ask these be marked B

21        and C or deem them marked B and C.

22             THE COURT:  I'll deem them Defendant's B

23        and C.

24             (Whereupon, the two documents were deemed

25        marked for identification as Defendant's Exhibits B

                              dc

Det. Faivus - People - Cross                    26

1          and C by the Court.)

2                    (Whereupon, the witness peruses the

3          documents and the following occurred:)

4          Q    Have you had an opportunity to look at them?

5          A    Yes.

6          Q    So we have some typographical error on every one

7     of them for the fact these people didn't know it was two

8     or four; correct?

9          A    No.  No.  It was typographical on all three of

10    them.

11         Q    When you say it's typographical, you have been a

12    detective for how many years?

13         A    Three years.

14         Q    You know how to make your paperwork?

15         A    No.  Being a detective and a typist is two

16    separate things.

17                    MS. CHAO:  Objection.

18                    THE COURT:  Sustained.

19         Q    You have had a lot of experience; right?  You

20    have done a lot of line-ups; right?

21         A    Yes.

22         Q    Is there any doubt in your mind that these

23    people were able to come in there and make some

24    identification?

25                    MS. CHAO:  Objection.

                              dc

Det. Faivus - People - Cross                         27

1           THE COURT:  That you can answer.

2      A    Repeat the question.

3      Q    Do you have any doubt in your mind that they

4  were able to come in and make some identification?

5      A    They identified number four.

6      Q    But as far as your paperwork which memorializes

7  that event about number two; correct?

8      A    Correct.

9           MR. BRACKLEY:  Judge, I have no further

10      questions.

11           THE COURT:  Is there any redirect by the

12      People, Ms. Chao?

13           MS. CHAO:  Just briefly.

14  REDIRECT EXAMINATION

15  BY MS. CHAO:

16      Q    Detective Faivus, to your recollection, the oral

17  conversation that you had with all three of the

18  complainants, what number did they identify?

19      A    Number four.

20      Q    And with respect to your paperwork where it

21  indicates that you asked him, where do you recognize

22  number two, can you explain to the Court what that --

23      A    Basically, it is a typographical error.  All I

24  do is copy and paste.  I just didn't change the number.

25      Q    What should number two be?

                         dc

```
 1       A     Number four.

 2       Q     And lastly I ask whether the robbery was

 3   depicted on the video?

 4       A     Yes.

 5       Q     You testified the defendant was in and out of

 6   the video.

 7       A     There's one part of the video where he does come

 8   out of the video and comes back around, yes.

 9       Q     Are you able to observe everything that's on the

10   video?

11       A     Not one hundred percent.

12                   MS. CHAO:  Thank you.

13                   No further questions.

14                   THE COURT:  Any recross?

15                   MR. BRACKLEY:  Yes.

16   RECROSS EXAMINATION

17   BY MR. BRACKLEY:

18       Q     When you say the defendant comes out of the

19   video, the video shows the table where these three guys

20   are; correct?

21       A     Yes.

22       Q     And as far as that's concerned, the angle never

23   changes; correct?

24       A     Right.  No.

25                   MR. BRACKLEY:  I have no further questions.
```

dc

1                    THE COURT:  Ms. Chao, do you have any

2        re-redirect by the People?

3                    MS. CHAO:  Briefly.

4    RE-REDIRECT EXAMINATION

5    BY MS. CHAO:

6        Q    Detective Faivus, did the robbery occur by the

7    table where the three complainants were seated?

8                    MR. BRACKLEY:  Objection.

9                    THE COURT:  That's sustained.  That's

10       beyond the scope.

11                   Now, go ahead, ask it.

12       Q    Detective Faivus, you were asked on recross

13   examination if a robbery was depicted on the video where

14   the three complainants were seated at a particular table.

15       A    No.

16                   MR. BRACKLEY:  Objection.

17                   THE COURT:  Where did the robbery occur?

18       Q    Where did the robbery occur?

19       A    It happened within -- it happened inside the

20   White Castle.

21       Q    In relation to the table --

22                   THE COURT:  On this tape you indicated

23       there was a depiction that one of the three

24       individuals, one of the three customers at the table

25       was chased.

                              dc

 1              THE WITNESS:  Yes.

 2              THE COURT:  Okay.  Did you get any

 3      information during the investigation, either the

 4      felony complaints, the Grand Jury stage or during the

 5      pretrial discovery here on the indictment where the

 6      alleged robbery is alleged to have occurred?

 7              THE WITNESS:  Yes, where it happened,

 8      inside of the White Castle.

 9              THE COURT:  But you have a portion of it

10      taped where inside the White Castle?  Because it's at

11      this point it's like an L shaped room.               .

12              THE WITNESS:  It's like -- it's shaped like

13      a U, counter at the front and the camera overlooks

14      the counter and where the bathroom area is.

15      Somewhere between the counter and bathroom, and as it

16      comes up, it appears it happened there.

17              THE COURT:  Mr. Brackley, do you want to

18      re-recross about that?

19      RE-RECROSS EXAMINATION

20      BY MR. BRACKLEY:

21         Q    When you say it happened, that's if the people

22      who were telling you when it happened were telling the

23      truth; right?

24         A    Yes?

25         Q    Which you don't know?

                            dc

1     A    No.

2     Q    How but as far as that video is concerned, it

3   just so happens it doesn't show any robbery; right?

4     A    Right.

5     Q    But it shows just about everything else; right?

6     A    Yes.

7              MR. BRACKLEY:  I have nothing further.

8              THE COURT:  Ms. Chao, anything?

9              MS. CHAO:  No further questions.

10             THE COURT:  Sir, thank you for coming in.

11             THE WITNESS:  Thank you.

12             THE COURT:  I will keep the items

13   introduced in your testimony until the conclusion of

14   this hearing.

15             Ms. Chao, are there any other witness by

16   the People?

17             MS. CHAO:  No, your Honor.

18             At this time the People rest.

19             THE COURT:  Mr. Brackley?

20             MR. BRACKLEY:  No witness at this time.  I

21   would rest on the record.

22             THE COURT:  Ms. Chao?

23             MS. CHAO:  So will the People, your Honor.

24             THE COURT:  Okay.  Thank you.

25             This case is on today for a Dunaway/Wade

                              dc

1       hearing.  The witness, Detective Joseph Faivus, has

2       testified in a candidly and forthright manner.  He's

3       a veteran of the New York City Police Department for

4       over thirteen years.  He's been assigned to the 114th

5       Precinct for twelve and a half years.  He's been a

6       detective for the previous three years.

7               He was working on December 13th, 2007 in

8       the Robbery Apprehension Module.  He was assigned to

9       investigate a robbery that's alleged to have occurred

10      at a White Castle at 21-02 Broadway.

11              On December 15th he went to the location of

12      the robbery, which is the White Castle store, and he

13      viewed a surveillance tape and was able to see some

14      of the incident on the surveillance tape.  He was

15      able to see what was provided to him.  He described

16      the incident, three people at a table having dinner.

17      There was an altercation between a person he

18      identifies as Mr. Collins and the three individuals.

19      There's a dispute.  Mr. Collins leaves.  Mr. Collins

20      comes back.  On the video he is able to see a silver

21      firearm and a chase that occurred between Mr. Collins

22      and Mr. Englesbobb.

23              There were certain descriptions that were

24      given by Mr. Englesbobb of the alleged perpetrator of

25      the criminal act.  On June 26th of 2008 the detective

1    received a positive report of a DNA hit.  Apparently,

2    a DNA sample was lifted from a White Castle bag, a

3    sack that was observed on the tape being held by

4    Mr. Collins.  There was a DNA match.

5              After the DNA match occurred, a Wanted Card

6    was prepared.  The day after the Wanted Card was

7    prepared, Mr. Collins was arrested, taken to the

8    114th Precinct where line-ups were held involving

9    individuals, Mr. Englesbobb, Mr. Vasilaropoulos and

10   Mr. Brown.

11             I am satisfied from the detective's

12   testimony that the witnesses were kept separate and

13   apart from the fillers in the line-up and were kept

14   apart from Mr. Collins.  Each of the individuals were

15   taken individually into the line-up room.  Each of

16   the three, Mr. Brown first, Mr. Vasilaropoulos was

17   taken in second and Mr. Englesbobb went in third.

18   All three individuals made positive identifications

19   identifying number four with Mr. Collins as the

20   alleged perpetrator of the event.

21             Mr. Brackley pointed out to the detective

22   and the detective admits the line-up report itself

23   indicates some discrepancy, to wit; that the

24   eyewitnesses pointed out number two rather than

25   number four.  The detective said that he basically

dc

1      made a typographical error, I don't know how

2      computers work all that great, but he said he used

3      the old form, basically typed over it, is what I got

4      out of it.

5              In my opinion, the line-up is a fair

6      line-up.  It doesn't seem to be unduly suggestive in

7      any way, shape or form.

8              Okay.  The Dunaway component, that is

9      satisfied through the DNA hit that provided probable

10     cause to effect the defendant's arrest.

11             With respect to the line-up identification,

12     I'm satisfied that the paperwork is a typographical

13     error and did not reflect what the three individuals

14     who made the identification said.  The line-up is not

15     unduly suggestive.  The identification testimony by

16     each of the three eyewitnesses is admissible at

17     trial.

18             What date for trial, please?

19             MR. BRACKLEY:  Judge, can we come up on

20     that?

21             THE COURT:  Sure.

22             (Whereupon, a discussion was held off the

23     record.)

24             MR. BRACKLEY:  Judge, pursuant to a

25     conversation I had with the Assistant regarding what

dc

1    I recognize to be an issue that's been arising in

2    cases involving DNA, that there's a procedure by

3    which the DNA has to be taken through a different

4    source based upon different rules.  I understand

5    that.

6              As you know, Mr. Collins has been trying to

7    get this case tried for some time now.  I have to go

8    along with the DNA.  I'm going to consent to it

9    because they have a right to take it from him.  I

10   think the Courts on the issue of speedy trial time

11   charge as to the Court not the defendant or the

12   People the time for that.  I would just ask the

13   Assistant to do it in all due diligence as quickly as

14   they can so we don't have to be hanging around for a

15   couple of months waiting for the results.

16             THE COURT:  There's consent for the DNA

17   swab.

18             What about your presence?  Do you wish to

19   be present when that's done?

20             MR. BRACKLEY:  No, Judge.

21             THE COURT:  TAP A, 4/20.  Case marked for

22   trial on that date.

23             MS. CHAO:  For the record, the People are

24   ready for trial.

25             THE COURT:  For the record, all of the

                         dc

1          items of evidence that have been introduced through

2          the detective's testimony have been returned to

3          Ms. Chao.

4                    And Mr. Brackley gets his Defense A, B and

5          C.

6                    MS. CHAO:  Thank you, your Honor.

7                         *         *         *

8      CERTIFIED TO BE A TRUE AND ACCURATE TRANSCRIPT OF THE

9      ORIGINAL STENOGRAPHIC MINUTES TAKEN OF THIS PROCEEDING.

10                       _Donna Conti_

11                         DONNA CONTI
                           SENIOR COURT REPORTER
12                         *   *   *   *   *

13                         INDEX TO WITNESSES

14                         DIRECT  CROSS  REDIRECT  RECROSS

15     FOR THE PEOPLE:

16     Det. Faivus              6       21     27,29    28,30

17                         INDEX TO EXHIBITS

18                         I.D.    EVIDENCE

19     FOR THE PEOPLE:

20     1-A Lineup depiction    -          20

21

22     FOR THE DEFENDANT:

23     A Document                         24

24     B Document                         25

25     C Document                         25

1

194/09
con

1   SUPREME COURT OF THE STATE OF NEW YORK

2   COUNTY OF QUEENS: CRIMINAL TERM : PART   K-20

3   ----------------------------------------x

4   THE PEOPLE OF THE STATE OF NEW YORK,      Indictment:
                                                1820-08
5                    -against-

6   RICHARD COLLINS,
                                            TRIAL
7                    Defendant(s).

8   ----------------------------------------x

9                        125-01 Queens Boulevard
                         Kew Gardens, NY 11415
10                       July 30, 2009

11

12  B E F O R E :

13           HONORABLE RONALD S. HOLLIE,
                  J U S T I C E

14

15  A P P E A R A N C E S :

16           RICHARD A. BROWN, ESQ.
             District Attorney, Queens County
             BY:   ROSEMARY CHAO, ESQ.,
17           Assistant District Attorney
             For the People

18           PATRICK BRACKLEY, ESQ.,
19           Atty. For the Defendant
             222 Broadway
20           New York, New York

21

22

23
                     VANESSA REYES
24              Senior Court Reporter

25

                                               vr

PO Leavey - People - Direct          2

1              COURT CLERK:   Officer, please raise your

2       right hand.

3              P O   G R E G   L E A V E Y, called as a

4       witness by and on behalf of the People, after

5       having been first duly sworn, was examined and

6       testified as follows:

7              COURT OFFICER:   At this time, the People

8       call Police Officer Greg Leavey, shield number

9       12537, of the Queens North Evidence Collection

10      Team.

11             THE COURT:   Counsel, please inquire.

12             MS. CHAO:   Thank you, Judge.

13   DIRECT EXAMINATION

14   BY MS. CHAO:

15      Q    Good afternoon, Officer Leavey.

16      A    Good afternoon.

17      Q    Officer Leavey, you're currently assigned to

18   the Evidence Collection Team?

19      A    Yes.

20      Q    And, approximately, how long have you been at

21   that command?

22      A    Five years.

23      Q    And what locations in Queens County does that

24   command cover?

25      A    Queens North.

                                                    vr

1       Q     And could you just tell us what is Queens

2   North?

3       A     Queens North is made up of eight precincts,

4   the 104, the 112, the 111, the 110, the 109, the 115

5   and the 108.

6       Q     And is it fair to say that Queens North also

7   encompasses Astoria, Queens?

8       A     Yes.

9       Q     And could you just describe to the members of

10  the jury some of your duties and responsibilities as

11  an officer in the Evidence Collection Team?

12      A     ECT is responsible for, basically, collecting

13  evidence, packaging at the scene and then processing

14  the evidence.

15      Q     Now, directing your attention to December

16  13th of 2007; were you working on that date?

17      A     Yes.

18      Q     And on that day at, approximately, 6:00 a.m.,

19  did you received an assignment in connection with this

20  case?

21      A     Yes.

22      Q     What was that assignment?

23      A     It was to respond to a gunpoint robbery.

24      Q     At what location?

25      A     At 21-01 Broadway.

                                                    vr

Case 1:15-cv-03686-ENV   Document 14-1   Filed 11/02/15   Page 40 of 165 PageID #: 1737

1    Q    Is that in the County of Queens?

2    A    Yes.

3    Q    And is it fair to say that that location is a

4  White Castle?

5    A    Yes.

6    Q    And, approximately, what time -- is it fair

7  to say that you arrived at that location at,

8  approximately, 6:35 a.m.?

9    A    Yes.

10   Q    And when you arrived at that location, did

11 you speak to any civilian witnesses?

12   A    Yes.

13   Q    Who did you speak to?

14   A    I spoke with Mr. Anthony Englesbobb.

15   Q    And do you recall speaking to any other

16 civilian witness?

17   A    The two other victims.

18   Q    But who did you primarily speak to?

19   A    To Mr. Englesbobb.

20   Q    And why Mr. Englesbobb?

21   A    He had -- he was the one that had the

22 property removed --

23           MR. BRACKLEY:   Objection, Judge.

24           THE COURT:   Overruled.

25   A    He was the victim that had the property

                                              vr

Case 1:15-cv-03686-ENV   Document 14-1   Filed 11/02/15   Page 41 of 165 PageID #: 1738

1  removed from his person.

2     Q    And did you speak to any other officers at

3  the scene?

4     A    Yes.   There was an officer guarding the

5  scene.

6     Q    And is it fair to say that there were several

7  officers at the scene?

8     A    Yes.

9     Q    And after you spoke to the witnesses and the

10  officers, what did you do?   You processed the crime

11  scene?

12     A    Yes.

13     Q    And could you tell the members of the jury

14  how you processed the crime scene?

15     A    Well, I went on the -- I spoke to the victim,

16  and he started pointing out things in the White Castle

17  dining room that was in relation to the robbery.

18     Q    Officer Leavey, did you --

19           MR. BRACKLEY:   I am going to object to

20     that, Judge.

21           THE COURT:   Overruled.

22     Q    Did you recover any property in connection

23  with this case?

24     A    Property?

25     Q    Did you recover any evidence?

                                             vr

PO Leavey - People - Direct                6

1     A     Evidence; yes, I did.

2     Q     And what did you recover?

3     A     I recovered a water bottle, plastic water

4  bottle, a plastic bag.

5     Q     White Castle bag?

6     A     A White Castle bag, and a holster, a canvas

7  holster.

8     Q     What type of holster?

9     A     For a gun.

10    Q     For a firearm?   .

11    A     For a firearm.

12    Q     And what color was the holster?

13    A     It was black.

14    Q     Where was the holster?

15    A     It was in the parking lot of White Castle.

16    Q     And what about the plastic White Castle bag?

17    A     That was sitting on top of a bench in the

18  dining room.

19    Q     And what about the water bottle?

20    A     That was on the floor of the dining room.

21    Q     How did you collect the evidence in this

22  case?  And I'm going to start with the water bottle.

23    A     I placed it in a brown paper bag and sealed

24  it.

25    Q     Now, prior to you sealing it in a paper bag,

                                            vr

1  could you describe the water bottle, whether it was

2  empty or filled?

3      A    It was empty.

4      Q    And how do you recall it being empty?

5      A    I went to shake out the excess water before I

6  placed it into the brown paper bag.

7      Q    And when you say "the excess water", how much

8  excess water?

9      A    Probably drops of water.

10     Q    And did the water bottle have a cap on it?

11     A    No.

12     Q    And did you voucher the water bottle?

13     A    Yes.

14     Q    Under what voucher number?

15     A    Voucher number N923797.

16     Q    I'm sorry N923797?

17     A    N923797.

18     Q    And what about the White Castle plastic bag,

19  how did you collect that bag for evidence?

20     A    I also placed it in a brown paper bag and

21  sealed it at the scene.

22     Q    And did you voucher that?

23     A    Yes.

24     Q    Under what voucher number?

25     A    Under voucher number N923798.

PO Leavey - People - Direct                    8

1      Q    And what about the black holster?  How did

2   you collect the black holster into evidence?

3      A    The same way, placed it in a brown paper bag

4   and sealed it.

5      Q    And did you voucher the black holster?

6      A    Yes.

7      Q    Under what voucher number?

8      A    N923798.

9      Q    And could you just explain what you mean by

10  voucher?

11     A    Every item gets a specific number, it's used

12  to track it through its movement to the department.

13              MS. CHAO:  Your Honor, if the witness may

14     be shown #1A, #1B and #1C in evidence.

15              (Exhibits shown to the witness.)

16     Q    Do you recognize #1A, #1B and #1C in

17  evidence?

18     A    Yes.

19              THE COURT:    And the numbers are on the

20     back, A, B, and C?

21              THE WITNESS:    Okay.

22     Q    Is it fair to say that you recognize #1A as

23  the water bottle that was recovered from the White

24  Castle?

25     A    Yes.

                                            vr

1      Q     And that's the same location where you

2   recovered the water bottle?

3      A     Yes.

4      Q     And is that also the photo that you took?

5      A     Yes.

6      Q     And how about #1B, which is the plastic bag

7   from White Castle; is it fair to say that that's where

8   you recovered the White Castle bag from White Castle?

9      A     Yes.

10     Q     And at the same location where you recovered

11  it from?

12     A     Yes.

13     Q     And, in fact, you're the one who took the

14  photograph; correct?

15     A     Correct.

16     Q     And #1C in evidence, that's where the black

17  holster was located at the time that you collected the

18  black holster into evidence; correct?

19     A     Yes.

20     Q     And this is a photograph of the black holster

21  that you, in fact, took a picture of; correct?

22     A     Yes.

23     Q     Now, Officer Leavey, did you submit any of

24  the evidence that you recovered for any sort of DNA

25  analysis?

1     A    Yes.

2     Q    And is it fair to say that you submitted all

3  three --

4                THE COURT:  Don't lead here.  Just ask

5     him.

6     Q    Officer Leavey, what did you submit for DNA

7  analysis?

8     A    I submitted the water bottle, the plastic bag

9  and the holster.

10               MR. BRACKLEY:  Judge, most respectfully,

11    I don't mind the leading at this time for this

12    purpose.

13               THE COURT:   Okay, thanks.

14    Q    And is it also fair to say that you sent

15 those items to the Office of the Chief Medical

16 Examiner's lab for them to conduct the DNA analysis?

17    A    Yes.

18    Q    And are you familiar with the term "run

19 number"?

20    A    Yes.

21    Q    What is a run number?

22    A    The run number is the way our office tracks

23 each case.

24    Q    So is it like a file number for you?

25    A    Yes.

1      Q      And what was the run number that pertains to

2    this case?

3      A      It was 4280.

4      Q      Of 2007?

5      A      Of '07; correct.

6      Q      And is it also fair to say that --

7    approximately, how long did you process this job for?

8      A      About five hours.

9      Q      So you were at the White Castle for,

10   approximately, five hours according to you; correct?

11     A      No, I was at the White Castle for probably

12   about one and a half to two hours.

13     Q      About two hours?

14     A      Correct.

15     Q      And you conducted a thorough -- well, you

16   processed -- you conducted a thorough evaluation of

17   the crime scene; correct?  Yes?

18     A      Yes.

19     Q      And, at any point, did you recover any sort

20   of blood from White Castle?

21     A      No.

22     Q      And, at any point, did you see any droppings

23   of blood from White Castle?

24     A      No.

25     Q      How about any blood on the plastic bag that

PO Leavey - People - Cross          12

1   you recovered from White Castle?

2        A    No.

3        Q    How about the holster that you recovered from

4   the White Castle?

5        A    No.

6        Q    And how about the water bottle that you

7   recovered from the White Castle?

8        A    No.

9        Q    And at the bench where you recovered the

10  plastic White Castle bag, did you see any blood

11  anywhere on those seats?

12       A    No.

13            MS. CHAO:   No further questions, Judge.

14  CROSS EXAMINATION

15  BY MR. BRACKLEY:

16       Q    Now, with respect to your arrival

17  investigation, did you have an opportunity, as you

18  said, to speak to a Mr. Englesbobb?

19       A    Yes.

20       Q    And you described to the assistant, sir, the

21  reason why you spoke to him was because he claimed to

22  be a victim at that time; correct?

23       A    Yes.

24       Q    And you were asked questions about whether

25  you made observations as to any blood; did you see any

                                                    vr

1  blood on Mr. Englesbobb?

2      A    No.

3      Q    Okay.  Is it also part of your responsibility

4  as not only a police officer but an evidence

5  individual, to determine if a victim of a crime is

6  injured or not?

7      A    That's patrol's duty, not -- I arrive after

8  the fact.

9      Q    Well, did you make any inquiries about that?

10     A    No.

11     Q    Did you get any information about whether or

12  not Mr. Englesbobb was injured or not?

13     A    No.

14          MR. BRACKLEY:  Well, Judge, if I can

15     have this marked Defendant's A for identification.

16          THE COURT:  It may not have to be marked,

17     just show it to him.

18          MR. BRACKLEY:  Okay.  If I may approach

19     the witness with your permission.

20          (Exhibit shown to the witness.)

21          MR. BRACKLEY:  If you want to take a

22     look at it and familiarize yourself with it.

23          THE COURT:  Officer, as you look through

24     that and then answer the question asked, you're

25     not -- the question is asking you what that says,

                                        vr

```
1        it's only you looking at that to see if it

2        refreshes your memory as to what it is that you

3        had saw or done.

4                THE WITNESS:   Okay.

5        Q    Okay.  Now, does that refresh your

6   recollection as to whether there was any designation

7   of injury to Mr. Englesbobb or not?

8                THE COURT:   Given to him or --

9                MR. BRACKLEY:   Yes, Judge.

10       Q    First given to you.

11       A    Well, on our paperwork --

12               THE COURT:   Well, no.  It isn't about

13       the paperwork, but only your memory.

14               Do you have any memory of anyone saying

15       to you that Mr. Englesbobb had been injured?

16               THE WITNESS:  No specific injury, no.

17               MR. BRACKLEY:   Okay.

18               THE COURT:   Meaning that you have no

19       memory of a report of injury or no memory of a

20       specific type of injury?

21               THE WITNESS:   No memory of a specific

22       type of injury.

23               THE COURT:   Okay.

24       Q    Do you recall, Officer, asking Mr. Englesbobb

25   if he had been injured?
```

1      A     No.

2      Q     Okay.  Do you recall whether or not, from

3  looking at him, he appeared to have any injury on him?

4      A     He didn't appear to have any injury.

5      Q     Thank you, sir.  Now, do you recall whether

6  or not you spoke to Mr. Englesbobb about what

7  property, if any, had been taken from him?

8      A     Yes.

9      Q     And did he indicate to you he had been the

10  victim or he had had a chain taken from him?

11      A     He told me a wallet.

12      Q     Okay.  Could you take a look at your

13  paperwork and see it that refreshes your recollection

14  as to whether or not Mr. Englesbobb told you that he

15  had a chain taken from him?

16      A     I wrote that --

17              THE COURT:   No, no.  It isn't about what

18      you wrote, it's about, again, whether or not you

19      have any memory of Mr. Englesbobb telling you that

20      a chain was taken from him.

21              THE WITNESS:   No.

22      Q     Okay.  Does the paper refresh your

23  recollection?

24      A     Yes.

25      Q     And did he?

                                                    vr

1    A   No.

2    Q   Okay.  And that was about -- what time did

3  you speak to Mr. Englesbobb that morning, sir?

4    A   Approximately 6:35.

5    Q   Okay.  And I take it the word that the

6  assistant used, you did a thorough job; correct?

7    A   Yes.

8    Q   You know how to ask questions and seek

9  evidence and speak to people who are victims of

10  crimes; correct?

11    A   Yes.

12    Q   You look like a fellow -- you've been in the

13  department for many years; correct?

14    A   Yes.

15    Q   It would be fair to say you're an experienced

16  guy; correct?

17    A   Yes.

18    Q   And you went there to do the best of your

19  ability to do your job; correct?

20    A   Correct.

21    Q   Now, with respect --

22        MR. BRACKLEY:  Judge, if I can just have

23    the evidence #1, #2 and #3, If I can just take

24    those, Judge?  If I can examine them from the side

25    to make it quicker.

1          THE COURT:    Sure.

2      Q    Now, would it be fair to say, sir -- do you

3  recall this photograph, that would be People's Exhibit

4  #1A, and pardon my standing over here, it would be

5  fair to say that that would be how the bottle was

6  first found; correct?

7      A    Yes.

8      Q    And then it would be photographed.  And then,

9  as you have indicated, it would be picked up and

10  processed or vouchered; is that fair to say?

11      A    Yes.

12      Q    Okay.  Now, and if I can hand you what's been

13  put into evidence as #1B, that would be a photograph

14  of the back or a booth at White Castle; correct?

15      A    Yes.

16      Q    And would it be fair to say from your memory

17  that that would be consistent with towards the back of

18  the restaurant by the door; correct?  If you remember?

19      A    I can't say for sure.

20      Q    Okay.  And if you can just hold up the

21  picture and show the jury, Officer.

22              (Witness complied.)

23      Q    Sir, that there is, in fact, material that

24  was up on the back of the chair; is that fair to say?

25      A    Yes.

                                              vr

1      Q     And that would be the White Castle bag;

2  correct?

3      A     Yes.

4      Q     And, in fact, on the bench of that -- there

5  is, in fact, material that would be consistent on --

6  let me ask you, what's on the bench?

7            THE COURT:  And the bench would be the

8       seat or the back of a seat?  What would the --

9            MR. BRACKLEY:    The seat, Judge.  Thank

10      you.

11           THE COURT:   Okay.

12     A     Food from the bag.

13     Q     Okay.  And that would be on the bench;

14  correct?

15     A     Correct.

16     Q     And you, in fact, observed that with your own

17  eyes; is that fair to say?

18     A     Yes.

19     Q     And if I may now, do you recall what time it

20  was that you spoke with Mr. Englesbobb?

21     A     When I arrived at the scene, I spoke to him.

22     Q     And for the purposes -- finally, sir, about

23  how long -- you said two hours you were at the

24  location; correct?

25     A     Approximately two hours.

                                              vr

1    Q    Were you, yourself, involve in any further

2  investigation of this case?  In other words, were you

3  called upon or requested to perform any other

4  functions other than the collection of evidence at

5  that location?

6    A    No.

7              MR. BRACKLEY:   Okay.

8              I have no further questions.  Thank you.

9              THE COURT:   Ms. Chao?

10             MS. CHAO:   Briefly.  Thank you.

11 REDIRECT EXAMINATION

12 BY MS. CHAO:

13   Q    Officer Leavey, is it your responsibility to

14 interview victims at great length?

15             THE COURT:   "At great length" meaning

16     what?

17   Q    In detail.

18   A    Not in detail, no.

19   Q    And who interviews the victims in detail?

20   A    Detectives and patrol first on the scene.

21   Q    And when you say "patrol", can you tell the

22 members of the jury what you mean by that?

23   A    The patrol are the officers that first arrive

24 at the scene of a crime in progress.

25   Q    And have you ever -- what about detectives;

Case 1:15-cv-03686-ENV   Document 14-1   Filed 11/02/15   Page 56 of 165 PageID #: 1753

1    what do you mean by that?

2         A    Well, detectives are in charge of

3    investigating the actual crime.

4         Q    Now, you were at White Castle for

5    approximately one and a half to two hours; is that

6    fair to say?

7         A    Yes.

8         Q    And approximately how long did you spend

9    speaking to Mr. Englesbobb?

10        A    He was in the restaurant while I was

11   processing the job.

12        Q    When were you processing the job or speaking

13   to Mr. Englesbobb?

14             MR. BRACKLEY:   Objection, Judge.

15             THE COURT:   If there's a difference.

16             MR. BRACKLEY:   Thank you.

17        A    I interviewed Mr. Englesbobb, and he had

18   pointed out certain items in the room for me to

19   process.

20        Q    And is it fair to say that you spent the one

21   and a half to two hours in White Castle primarily

22   processing the crime scene?

23        A    Yes.

24        Q    Packaging, collecting, sealing?

25        A    Yes, yes.

                                             vr

1      Q    Is that correct?

2      A    Correct.

3      Q    And you were asked whether or not Mr.

4    Englesbobb had any injuries; were you able to see

5    whether or not he had blurred vision?

6                MR. BRACKLEY:   Objection.

7                THE COURT:   Overruled.

8      A    No.

9      Q    Were you able to see whether or not he had a

10   migraine?

11     A    No.

12                MS. CHAO:   No further questions.

13   RECROSS EXAMINATION

14   BY MR. BRACKLEY:

15     Q    Okay.  But there is, in fact, something that

16   is called a refuse medical attention card; correct?

17     A    Yes.

18     Q    And that is, in fact, for somebody who may be

19   injured but who just doesn't want medical attention;

20   correct?

21                THE COURT:   Is that -- even if there is

22        such a card --

23                Well, first, are you aware of such a card

24        or form?

25                THE WITNESS:   I am, but, again, that's

                                            vr

PO Leavey - People - Recross          22

1      not my responsibility; that would be patrol's

2      responsibility.

3      Q    Okay.  So, in other words, as far as your

4   interview of Mr. Englesbobb is concerned, you were

5   aware were you not, when you were speaking to him,

6   Officer Leavey, that he claimed to be a victim of a

7   crime; correct?

8      A    Yes.

9      Q    And you were speaking to him with respect to

10  what happened and what he knew; correct?

11     A    Yes.

12     Q    You have a form you fill out that has

13  questions and answers, correct, or the things he said

14  happened to him; correct?

15     A    Yes.

16     Q    And when you interviewed him, did you give

17  him   short -- he didn't really care what he was

18  saying?  In other words, you asked him what happened,

19  what was taken from you; correct?

20     A    Yes.

21     Q    And you made a record of it; right?

22     A    Correct.

23              MR. BRACKLEY:   I have no further

24     questions.

25              THE COURT:   Thank you, Officer.

                                              vr

Det. Faivus - People - Direct          23

1               (Witness exited.)

2               THE COURT:    People, call your next

3       witness.

4               MS. CHAO:    Your Honor, at this time, the

5       People call Detective Faivus.

6               THE COURT:    In the meantime, approach.

7               (Whereupon a bench conference was held

8       off the record.)

9               (Witness entering.)

10              D E T.   J O S E P H   F A I V U S, called

11      as a witness by and on behalf of the People, after

12      having been first duly sworn, was examined and

13      testified as follows:

14              COURT OFFICER:   The People call Detective

15      Joseph Faivus, shield number 1848, of the 114

16      Precinct.

17              THE COURT:   Please inquire, People.

18              MS. CHAO:   Thank you.

19      DIRECT EXAMINATION

20      BY MS. CHAO:

21          Q    Good afternoon, Detective Faivus.

22          A    Good afternoon.

23          Q    Detective Faivus, how long have you been

24      employed which the New York Police Department?

25          A    A little over 13 years.

                                                    vr

Det. Faivus - People - Direct          24

1      Q      And of those 13 years, approximately how long

2   have you been a detective for?

3      A      Two and a half.

4      Q      What command are you currently assigned to?

5      A      One-fourteen Squad.

6      Q      And, approximately, how long have you been at

7   the 114?

8      A      Over 12 years.

9      Q      And is it fair to say that the 114 covers

10  Astoria, Queens?

11     A      Yes.

12     Q      And can you just describe some of your duties

13  and responsibilities as a detective in the 114

14  Precinct?

15     A      I investigate all -- I investigate all the

16  robberies, 61 or complaints that were filed within the

17  confines.

18     Q      Now, directing your attention to some date

19  after December 13th, 2007, on or about December 13th,

20  2007; did there come a time when you received an

21  assignment in connection with this case?

22     A      Yes, I did.

23     Q      And what was that assignment?

24     A      To investigate a 61 for a robbery that had

25  happened at 21-03, I think it was, Broadway, at a

                                                    vr

1    White Castle.

2         Q    And the White Castle, is it fair to say that

3    its 21-01 Broadway?

4         A    I'm sorry, yes.

5         Q    And a 61, can you just tell the members of

6    the jury what a 61 is?

7         A    Sixty-one is a report taken by the New York

8    City Police Department, which is any type of complaint

9    that's within -- once it's taken, it's broken down

10   into different categories depending on what the

11   complaint is made for.

12        Q    Do you remember who the civilian witnesses

13   were that pertained to this case?

14        A    Yes.

15        Q    And could you tell us who they are?

16        A    Mr. Englesbobb, Mr. Vasilis and Mr. Brown.  I

17   apologize.

18             THE COURT:    No, it's okay.  Yours was

19        far better each time.

20        Q    And is it fair to say that their names are

21   Corinthian Brown, Anthony Englesbobb and Perikles

22   Vasilis?

23        A    Yes.

24        Q    Now, directing your attention to December

25   15th of 2007; on or about that date, did you have an

                                                        vr

1    opportunity to go to the White Castle?

2        A    Yes, we did.

3        Q    And what was the purpose of going to the

4    White Castle?

5        A    To speak to the manager in retrieving video

6    that was made a copy available for us.

7        Q    And when you say "video", did you get the

8    video from White Castle?

9        A    Yes, I did.

10       Q    Do you recall who you received the video

11   from?

12       A    Ms. Green.

13       Q    And is that Tameka Green?

14       A    Yes.

15       Q    Is it fair to say that Tameka Green is a

16   female?

17       A    Yes.

18       Q    And you didn't receive the video surveillance

19   by an individual named Kenneth Belzar; is that

20   correct?

21              MR. BRACKLEY:   Objection, Judge.

22              THE COURT:   Overruled.

23       A    No.

24       Q    And the video, did you have an opportunity to

25   review the video?

                                                      vr

Case 1:15-cv-03686-ENV   Document 14-1   Filed 11/02/15   Page 63 of 165 PageID #: 1760

1      A    Yes.

2      Q    And is it fair to say that it's a four-frame

3   video surveillance?

4      A    Yes, it is.

5      Q    And after you received the video from Ms.

6   Green, directing your attention to December 20th of

7   2007, at approximately 9:30 in the evening at the 114

8   Precinct, did you conduct a photo manager with Mr.

9   Englesbobb?

10      A    Yes; yes, I did.

11      Q    And can you explain to the members of the

12   jury what's a photo manager?

13      A    Photo manager is a computer program where it

14   shows anywhere from six to nine people of similar

15   characteristics depending on what we enter.

16      Q    And is it true that Mr. Englesbobb looked at

17   approximately 1500 pictures?

18      A    Approximately, yes.

19      Q    And approximately two photo albums?

20      A    Yes.

21      Q    And between male blacks from 25 and 35 years

22   old?

23      A    Yes.

24      Q    And is it true that Mr. Englesbobb was unable

25   to pick out any individuals based on the photo

                                                    vr

Det. Faivus - People - Direct          28

1    manager, the pictures or the photo albums?

2        A    Yes.

3        Q    And is it also fair to say, at that point in

4    time, you had closed the case?

5        A    Yes.

6        Q    Now, directing your attention to June 26 of

7    2008, approximately, six months after the incident,

8    at, approximately, 8:00 p.m. in the evening, were you

9    at the 114 Precinct?

10       A    Yes, I was.

11       Q    And did you receive a fax from the DNA

12   Investigating Tracking Unit?

13       A    Yes.

14       Q    And can you tell the members of the jury what

15   that fax pertained to?

16       A    Basically, it is a fax containing -- saying

17   there was a positive identification on a DNA tested

18   from the robbery scene.

19       Q    And is it fair to say that it was from the

20   White Castle's plastic bag?

21       A    Yes.

22       Q    And, at that point, is it fair to say you

23   reopened the case?

24       A    Yes, I did.

25       Q    And are you familiar with the term I-card?

                                                    vr

Det. Faivus - People - Direct          29

1      A     Yes.

2      Q     What is an I-card?

3      A     I-card is when you have a positive

4   identification, you're looking for someone, you submit

5   this to our warrant team with all the information, and

6   usually -- they will usually put in a broadcast.  If

7   the name is ever ran by computer, it will pop up that

8   he's wanted either as a witness or a perpetrator to an

9   investigation.

10      Q     And this I-card was generated on the same day

11   that it was received by you which was June 6, 2008;

12   correct?

13      A     Yes, it was.

14      Q     And who was the wanted card for?

15      A     Richard Collins.

16      Q     And do you see Mr. Collins in the courtroom

17   today?

18      A     Yes, I do.

19      Q     Can you identify an article of clothing that

20   Mr. Collins is wearing?

21      A     A gray shirt, gray tie.

22            THE COURT:   Indicating the defendant.

23            MS. CHAO:   Thank you, Judge.

24      Q     Now, directing your attention to the next

25   day, June 27th, 2008, at, approximately, 4:30 p.m., at

                                              vr

1    the 114 Precinct, did you conduct lineups on that day?

2        A    Yes, we did.

3        Q    And who did you conduct the lineups with?

4        A    Mr. Englesbobb, Mr. Brown, Mr. Perikles.

5        Q    And, at that point, is it fair to say the

6    defendant was apprehended on June 27 of 2008?

7        A    Yes.

8        Q    And who was present in the lineup room?

9        A    Each of the complainants separately, ADA

10   Clark and the supervisor from the squad.

11       Q    So is it fair to say that the victims viewed

12   the lineups separately?

13       A    Yes.

14       Q    And directing your attention to,

15   approximately, 4:30 p.m., is it fair to say that

16   Corinthian Brown had viewed the lineup?

17       A    Yes.

18       Q    And how many people were depicted or seen in

19   the lineup?

20       A    Six.

21       Q    And do you recall the questions that you

22   asked Mr. Brown?  Only the questions that you asked.

23       A    Yes.

24       Q    What were those questions?

25       A    "Do you recognize anybody", "where do you

                                            vr

1   recognize them from".

2       Q    And what number?

3       A    And what number.

4       Q    And did there come a time, at, approximately,

5   4:35, approximately, that Perikles Vasilis viewed the

6   lineup?

7       A    Yes.

8       Q    And did you ask him the same three questions

9   that you asked Mr. Brown?

10      A    Yes, I did.

11      Q    And at, approximately, 4:40, approximately,

12  did Mr. Englesbobb viewed the lineup?

13      A    Yes.

14      Q    And you asked him the same questions as you

15  asked the other two victims?

16      A    Yes.

17      Q    And, again, this lineup was conducted of each

18  victim independently; correct?

19      A    Yes.

20      Q    Do you recall if -- who was seated in seat

21  #4?

22      A    Yes.

23      Q    And who was that?

24      A    Richard Collins.

25      Q    And after the victims, all three of them

                                              vr

1    viewed the lineup, did you take official police

2    action?

3         A    Yes.

4         Q    What did you do?

5         A    Placed him under arrest.

6         Q    Now, I want you to just take a look at

7    People's #2A and B that's in evidence.

8              (Exhibit shown to the witness.)

9         Q    Do you recognize People's #2A and B in

10   evidence?

11        A    Yes.

12        Q    What do you recognize it to be?

13        A    This is the lineup from that night.

14        Q    And are those -- do those photos fairly and

15   accurately depict what the lineup looked at the time

16   that the victims viewed the lineups?

17        A    Yes.

18        Q    And could you just hold it up to the members

19   of the jury?

20              (Witness complied.)

21        Q    Detective Faivus, is it fair to say that all

22   the participants in the lineup are wearing caps

23   backwards and a plastic bag --

24        A    Yes.

25        Q    -- that's covering the front of them?

                                        vr

1    A    Yes.

2    Q    And what's the purpose of wearing a black --

3    what was the purpose of wearing hats and plastic bags?

4    A    Basically, to make the lineup look uniformed,

5    everything basically the same.

6    Q    Now, when you placed the defendant under

7    arrest, did you take pedigree information from him?

8    A    Yes.

9    Q    And what was his ethnicity?

10    A    Richard Collins.

11    Q    And approximate height for Richard Collins?

12    A    Six foot.

13    Q    And do you have your online --

14    A    Yes.  Would you like me to -- I'll read it

15    off there, yeah.  Six foot two.

16    Q    What about his weight?

17    A    Two hundred pounds.

18    Q    And how about his age?

19    A    Age 29.

20    Q    Now, based upon your police investigation of

21    -- well, did there come a time that you learned the

22    defendant's address?  Where he resided?

23    A    Yes.

24    Q    And based upon your police investigation of

25    this case, were there any registered vehicles to his

vr

1  address?

2       A    Yes, there was.

3       Q    And what type of vehicle?

4       A    It was a gray SUV.

5       Q    Now, directing your attention to March 11th

6  of 2009, do you remember that date, or the DNA swab?

7       A    March 11, yes.

8       Q    What did you do in connection with this case

9  with respect to the DNA swab?

10      A    Accompanied you to Queens Houses where -- I'm

11 sorry --

12      Q    Did you take a DNA swab of the defendant?

13      A    Yes.

14      Q    And can you explain how you took the DNA swab

15 from the defendant?

16      A    Basically, it was ten wipes of each cheek.

17           THE COURT:   Inside?

18           THE WITNESS:   Inside his mouth.

19      Q    And what did you do with the swab?

20      A    Vouchered it.

21      Q    Under what -- is it fair to say you vouchered

22 the DNA swab taken of the date from the defendant of

23 inside his cheek under voucher number P585391?

24      A    I have to see it, but, yes.

25           MS. CHAO:   Your Honor, if the witness may

                                             vr

1        just be shown --

2                THE COURT:    Sure.

3        Q    What voucher number did you voucher?

4        A    P, Peter, 585391.

5        Q    Where did you submit the defendant's DNA

6    analysis?

7        A    To the ME's Office for examination.

8        Q    You testified to the ME's before; is it fair

9    to say the Office of the Chief Medical Examiner?

10       A    Yes.

11       Q    Now, Detective Faivus --

12               MS. CHAO:    Judge, I have no further

13       questions for Detective Faivus.

14               MR. BRACKLEY:   Let me just approach for

15       one second, Judge.

16               THE COURT:    Sure.

17               (Whereupon sidebar was held as follows:)

18               MR. BRACKLEY:   Judge, for the record,

19       that is, in this business what we call a beautiful

20       save, with the Queens Houses, if can I say so

21       myself.

22               THE COURT:    Yeah.

23               MR. BRACKLEY:    I would just ask that we

24       move, at this point, to strike that little

25       portion.   I'm not going to make an issue out of

                                              vr

1      it, I don't think anybody heard it or could care

2      less.  But just for the record, before I forget,

3      the mentioning to Queens Houses, I think that it

4      was unintentional, I make no claim about it.  I

5      don't think anybody heard it and it was completely

6      unintentional.

7                  MS. CHAO:  And, your Honor, just for the

8      record, the witness had mentioned Queens Housing,

9      I stopped him right there --

10                 MR. BRACKLEY:  Beautiful, Judge.

11                 THE COURT:   That was a save.

12                 MR. BRACKLEY:  That's what's called

13     being in the presence of a true professional.

14                 Thank you, Judge.

15                 (Sidebar concluded.)

16  CROSS EXAMINATION

17  BY MR. BRACKLEY:

18      Q    Detective Faivus, sir, as of December 13 of

19  2007, how long have you been with the New York City

20  Police Department?

21      A    You really have to speak up.  I apologize.  I

22  can't really hear you talk.

23      Q    As of December 13th, 2007, how long have you

24  been with the New York City Police Department?

25      A    A little under 12 years maybe.

                                                    vr

Case 1:15-cv-03686-ENV   Document 14-1   Filed 11/02/15   Page 73 of 165 PageID #: 1770

1     Q    Is it fair to say that you have probably

2  achieved the -- or performed the job from everything

3  from patrolmen all the way up to where you were a

4  detective; correct?

5     A    Yes.

6     Q    You were out on patrol, you walked the beat.

7  Now you, I assume with your seniority, you get to

8  become a detective and that's where you found yourself

9  on December 13th; correct?

10    A    On December 13th of 2006?

11         THE COURT:   Of '06?

12    Q    '07?

13    A    '07, I'm still a police officers,

14  technically.

15    Q    So at the time you get involved in this case

16  would be around what date?

17    A    The next day, probably within 12 hours of it.

18    Q    And it's, at that point, you're asked to

19  investigate; correct?

20    A    Yes.

21    Q    You perform some functions with respect to

22  that; right?

23    A    Yes.

24    Q    And did you do that?

25    A    Yes.

                                                    vr

1      Q    And did you have the information, at that
2    time, that this was an alleged robbery; correct?
3      A    Yes.
4      Q    At a White Castle restaurant; correct?
5      A    Yes.
6      Q    Involving three people who, at that point,
7    you were able to identify; correct?
8      A    Yes.
9      Q    The names of Vasilis, Corinthian Brown and
10   Mr. Englesbobb; correct?
11     A    Yes.
12     Q    And it's fair to say that at some point, and
13   I think it would be the 27th of June of '08, that's
14   the date that you performed the lineups; correct?
15     A    Yes.
16     Q    And in addition to performing the lineups,
17   you indicated that each of those three men had come
18   down to the precinct; correct?
19     A    Yes.
20     Q    And you had an opportunity to speak to them;
21   did you not?
22     A    Yes.
23     Q    To speak to them about what had happened;
24   correct?
25     A    Yes.

                                              vr

Det. Faivus - People - Cross          39

1      Q      And to speak to them about the incident, so
2   to speak; correct?
3      A      And what had happened.
4      Q      What had happened at the White Castle?
5      A      Okay.  Yes.
6      Q      And, in fact, it's fair to say, is it not,
7   that on the 27th, you swore out what was called a
8   criminal court complaint; correct?
9      A      Yes.
10     Q      And you're aware, are you not, sir, that when
11  you swear out that complaint, it's a sworn statement
12  by you; correct?
13     A      Yes.
14     Q      Certain facts and certain pieces of
15  information that's given to you by the alleged
16  complainants; correct?
17     A      Yes.
18     Q      About the incident; correct?
19     A      Yes.
20     Q      Okay.  And it's fair to say that about that
21  point, you've been in the police department for over
22  ten years; correct?
23     A      Yes.
24     Q      And you know how to interview people; do you
25  not?

                                             vr

Det. Faivus - People - Cross          40

1       A     Yes.

2       Q     And you've probably had your share of many

3  interviews prior to that of not only victims, but so

4  on and so forth; correct?

5       A     Yes.

6       Q     So at the time that you were running those

7  lineups, and for the purposes of the jury and when all

8  this is said and done, do the best you can to run that

9  lineup fairly; correct?

10      A     Yes.

11      Q     Because you don't want to suggest who it is,

12  you have three guys that point him out; correct?

13      A     Yes.

14      Q     And, in fact, they did make some designation,

15  and you --

16      A     Yes.

17      Q     -- made a record of it; correct?

18      A     Yes.

19      Q     And so you have three men that were there and

20  a lineup was conducted, whatever happens, and then you

21  have an opportunity to speak to them; correct?

22      A     Yes.

23      Q     Okay.  Now, at some point after the lineups,

24  you said that there was a wanted card dropped, you had

25  a name and address and then within a day, you arrested

                                              vr

1  Mr. Collins; correct?

2      A    Yes.

3      Q    And I believe that you had an address that

4  you were going to go to; correct?

5      A    Yes.

6      Q    You knew that there was a vehicle at that

7  address; correct?

8      A    Yes.

9      Q    Now, you knew this was a robbery case;

10 correct?

11     A    Yes.

12     Q    Now, did you obtain a search warrant to

13 search the house or the vehicle prior to going there?

14     A    No.

15     Q    And you knew there was a claim, at least,

16 that there had been some property taken; correct?

17     A    Yes.

18     Q    And a weapon used; correct?

19     A    Yes.

20     Q    And did you obtain a search warrant to search

21 either the vehicle or the home of the defendant for

22 any evidence?

23     A    Nope.

24     Q    Okay.  So at the time that you or --

25 withdrawn.  So now Mr. Collins is then arrested;

                                               vr

1    correct?

2         A    Yes.

3         Q    And that would be on what date?

4         A    The 27th.

5         Q    Okay.  And, in fact, when you spoke to those

6    three individuals on the 27th, did you speak

7    specifically to a Mr. Corinthian Brown?

8         A    Yes.

9         Q    Okay.  And did Mr. Corinthian --

10              MR. BRACKLEY:  I'm just going to have

11         this now, at this point, marked Defendant's A for

12         identification.

13              THE COURT:  That's two pages marked for

14         identification.

15              (Whereupon exhibit was marked for

16         identification.)

17         Q    Detective Faivus, sir, can you take a look at

18    the two pages that comprise defendant's A for

19    identification?

20         A    Yes.

21         Q    And is that, in fact, your criminal court

22    affidavit?

23         A    Yes, it is.

24         Q    And is it fair -- and it bears your

25    signature; does it not?

                                                      vr

Det. Faivus - People - Cross          43

1      A     Yes.

2      Q     And it relates to the case of the People of

3  the State of New York against Richard Collins?

4      A     Yes, it is.

5             MR. BRACKLEY:   If I may just approach

6      and just point to something without the question.

7             And just look up when you're finished.

8             (Pause in proceedings.)

9             THE COURT:   I'm sorry.

10            And, Detective, the rule is that you will

11     not be asked what that says.

12            THE WITNESS:   Okay.

13            THE COURT:   You'll be asked questions

14     about whether or not it refreshes your memory of

15     what it is that refreshes your recollection to the

16     point that you can answer the questions asked by

17     counsel.

18            THE WITNESS:   Okay.

19     Q     Now, Corinthian Brown gave you a description

20  of what had happened to him on that day?

21     A     Yes.

22     Q     And did Mr. Brown tell you that he was in a

23  White Castle and that there is an attempt made to take

24  his chain?

25     A     No.

                                                      vr

Det. Faivus - People - Cross          44

1     Q    Okay.  And when you say, "no", did, in fact,
2  Mr. Brown tell you that a gun had been pointed at him?
3     A    No.
4     Q    Did he tell you that a chain had been
5  demanded from him?
6     A    No.
7     Q    Okay.
8          MR. BRACKLEY:   Okay.  If I can have that
9     back.
10    Q    And that date of that signing of that
11 affidavit would be the 27th of June; correct?
12    A    Yes.
13    Q    Of '08?
14    A    Yes.
15    Q    At the time of the lineups?
16    A    Yes.
17    Q    And you also had an opportunity to speak with
18 a man by the name of Anthony Englesbobb; is that fair
19 to say?
20    A    Yes.
21         MR. BRACKLEY:   And if I could approach
22    with the same set of circumstances that you had
23    outlined, Judge, and just point the detective to
24    that top paragraph.
25         THE COURT:   Sure.

                                             vr

1              (Document handed to the witness.)

2        Q     Did you have an opportunity to speak to a

3    fellow by the name of Anthony Englesbobb?

4        A     Yes.

5        Q     And he was somebody who alleged to be the

6    victim of a crime; is that fair to say?

7        A     Yes.

8        Q     Did Mr. Englesbobb tell you that he had a

9    chain stolen from him?

10       A     No, not --

11             THE COURT:    No.

12             THE WITNESS:    Not according to --

13             THE COURT:    Okay.  That's the point that

14       I wanted to be very clear with you.

15             It is very easy and very tempting to, as

16       you read something that you wrote, to give an

17       answer based upon what it is that you see, but you

18       are not being asked to tell us what that says.

19       You're only being asked to look at it, you know,

20       place it to the side and make a judgment as to

21       whether or not you recall enough of what you were

22       told to answer questions asked.

23             THE WITNESS:    Okay.

24             THE COURT:    It may well be it does

25       refresh your memory of what you had been told, or

                                                    vr

1        seeing it, it may not fully refresh your memory as

2        to what you were told.

3                THE WITNESS:   Okay.

4                THE COURT:   Counsel?

5        Q    Does it refresh your recollection as to

6    whether he told you a chain had been taken?

7        A    I don't recall, no.

8        Q    Okay.  In other words, he did not tell you

9    that?

10       A    I don't recall the whole --

11       Q    Okay.  But you have a document there that you

12   took after speaking to him; correct?

13       A    Yes.

14       Q    I am going to ask you to take -- have an

15   opportunity to look at that paragraph; and after

16   reading that, does that refresh your recollection if

17   Mr. Englesbobb ever told you that he never had a chain

18   taken from him?

19               THE COURT:   Well, that's asked and

20       answered.

21               He has, in fact, read the document and I

22       imagine my instructions --

23               THE WITNESS:   Mm-hm.

24               MR. BRACKLEY:   Well, Judge, if we could

25       approach for one second.

                                                    vr

1          THE COURT:   I don't see that's

2    necessary.

3          MR. BRACKLEY:   Well, Judge, it's what I

4    believe I'm seeking to have it admitted as a prior

5    inconsistent statement of Mr. Englesbobb.  And for

6    that limited purpose, it's not whether his

7    recollection is refreshed, it's whether it's on

8    the document or not.

9          THE COURT:   Denied, because he had not,

10   you know -- as you know, Mr. Englesbobb had not

11   corroborated that, meaning that he had the

12   affidavit, meaning that he had not read it through

13   or --

14   Q    Well, Detective, after you speak to somebody,

15   prior to writing out that affidavit, do you not

16   attempt to get a full investigation from that person?

17         THE COURT:   What does that mean?

18   Q    In other words, do you not speak to a victim

19   and attempt to get a full investigation of what had

20   happened?

21         THE COURT:   After it's written?

22         MR. BRACKLEY:   Before.

23         THE COURT:   Oh.

24   Q    Before you fill out a criminal court

25   affidavit, you have an opportunity to speak to the

                                                vr

Det. Faivus - People - Redirect        48

1  alleged victim; correct?

2      A    Yes.

3      Q    And did you not speak to that victim and seek

4  to get a complete version of what happened to the

5  best --

6      A    To the best I can, yes.

7      Q    Because that document now becomes the

8  document that charges the person; correct?

9      A    Yes.

10              MR. BRACKLEY:  You know, I have no

11          further questions.

12              THE COURT:   People cross -- re-direct?

13              MS. CHAO:   Yes, your Honor.

14  REDIRECT EXAMINATION

15  BY MS. CHAO:

16      Q    Detective Faivus, you were asked about the

17  document which is called an accusatory instrument;

18  correct?

19      A    Yes.

20      Q    And it's a document that you reviewed and

21  signed; right?

22      A    Yes.

23      Q    And are you familiar with the term

24  "corroborating affidavit"?

25      A    Yes.

1    Q    What is a corroborating affidavit?

2    A    Usually, it's when the complainant reads it

3  and signs it agreeing with what was written.

4    Q    And is that the accusatory instrument that

5  you reviewed and signed?

6    A    Yes.

7    Q    And the complainant would then be given an

8  opportunity to review the same accusatory instrument

9  and sign it or make corrections; correct?

10   A    Yes.

11   Q    Did Corinthian Brown review the accusatory

12 instrument?

13   A    No, he did not.

14   Q    And was he ever given an opportunity to

15 review the accusatory instrument?

16   A    No, he was not.

17   Q    And how about Perilis Vasilis; did he ever

18 read the accusatory instrument?

19   A    No.

20   Q    And did he ever sign a corroborating

21 affidavit?

22   A    No.

23   Q    And what about Anthony Englesbobb; did he

24 review the accusatory instrument?

25   A    No, he did not.

1    Q    And he never signed a corroborating

2   affidavit?

3    A    No.

4    Q    Now, you were also asked as to whether or not

5   Mr. Englesbobb informed you that a chain had been

6   taken from him by the defendant at the time of the

7   robbery; do you remember that line of questioning?

8    A    Yes.

9    Q    And is it fair to say that you didn't

10  interview Mr. Englesbobb until, approximately, June of

11  2008; correct?

12   A    Right.

13   Q    And it's, approximately, six months after the

14  robbery; isn't that right?

15   A    Yes.

16   Q    And it's also fair to say that you have a

17  file for this case; correct?

18   A    Yes.

19   Q    And inside your file contains what's called

20  DD-5s?

21   A    Yes.

22   Q    And can you explain to the members of the

23  jury what DD-5s are?

24   A    DD-5s are basically a written step of what

25  I've done during the investigation.

                                          vr

1      Q      And how about DD5s from other detectives?

2      A      Yes.

3      Q      And are you familiar with which officers

4   responded to the incident immediately after it

5   happened?

6      A      Officers or detectives?

7      Q      Both officers and detectives.

8      A      There was Detective Hooker, Police Officer

9   Terrence Floyd, and I don't recall the third.

10     Q      Detective Andrew Costello sound familiar to

11   you?

12     A      Yeah, I think.

13     Q      And is it fair to say that Detective Hooker,

14   Costello and Officer Terrence's paperwork are

15   contained in your file that pertain in this case?

16     A      Yes.

17     Q      And have you had an opportunity to review

18   Detective Hooker's paperwork with respect to this

19   case?

20     A      Yes.

21             MS. CHAO:   And, your Honor, if I can just

22       hand the witness --

23             MR. BRACKLEY:   Objection.

24             MS. CHAO:   I'm not introducing it into

25       evidence.

                                              vr

Det. Faivus - People - Redirect        52

1           MR. BRACKLEY:   Objection.

2           THE COURT:   Approach please.

3           (Whereupon a bench conference was held

4      off the record.)

5           THE COURT:   Objection sustained.

6      Q    Detective Faivus, did you review Detective

7  Hooker's DD-5 in connection with this case?

8           MR. BRACKLEY:   Objection.

9           THE COURT:   That's a yes or no answer.

10     A    Yes.

11     Q    And at what point did Detective Hooker

12 interview the victim?

13     A    That night.

14     Q    And does it include whether or not a chain --

15          MR. BRACKLEY:   Objection.

16          THE COURT:   Sustained, sustained,

17     sustained.

18     Q    Detective Faivus, did you review what's

19 called a 61 in this case?

20     A    Yes.

21     Q    And who prepared the 61 in this case?

22     A    Excuse me?

23     Q    Who prepared the 61 in this case?

24     A    Officer Floyd.

25     Q    And what is a 61?

                                        vr

1    A    It's a complaint report filed.

2    Q    And when was the 61 generated?

3    A    The night of the incident.

4    Q    And did it include the items that were taken?

5              MR. BRACKLEY:   Objection.

6              THE COURT:   That's a yes or no answer.

7    A    Yes.

8    Q    Did it include credit cards?

9              MR. BRACKLEY:   Objection.

10             THE COURT:   Sustained as to --

11             MR. BRACKLEY:   Move to strike that

12   question.

13             THE COURT:  The question without an

14   answer is not evidence.

15             Objection to the question is sustained.

16   Q    And also in Detective Hooker's paperwork, did

17   it include whether or not Mr. Englesbobb was struck

18   with anything?

19             MR. BRACKLEY:   Objection.

20             THE COURT:   Sustained, sustained.

21   Q    Detective Faivus, Detective Hooker, Costello

22   and Officer Floyd were the officers who immediately

23   interviewed the victims when the incident -- after the

24   incident occurred?

25             MR. BRACKLEY:   Objection.

                                              vr

1          THE COURT:    That's a yes or no answer.

2     A    Yes.

3     Q    And at what point did you interview the

4  victims?

5     A    Well, after time, you know, a couple --

6     Q    Approximately six months later?

7     A    Yeah.

8     Q    And when you interviewed the three victims,

9  who did you interview at length?

10    A    Mr. Englesbobb.

11    Q    And did you speak to Mr. Brown?

12    A    Briefly, yes.

13    Q    And when you say "briefly", can you tell the

14  members of the jury how much time you spent with him?

15          THE COURT:    If you know.

16    A    Maybe five minutes, ten minutes.

17    Q    What about Perikles Vasilis?

18    A    About the same.

19    Q    And how about Mr. Englesbobb?

20    A    A little bit more, about 15 to 20 minutes

21  maybe.

22    Q    And prior to interviewing them, you had a

23  file on this case; correct?

24    A    Yes.

25    Q    And your colleagues' paperwork were contained

                                              vr

1   in that file; correct?

2              MR. BRACKLEY:   Objection, Judge.

3              THE COURT:   Overruled.

4       A    Yes.

5       Q    And Detective Faivus, you were just asked, on

6   cross examination, whether or not a search warrant was

7   executed for the defendant's house.

8       A    Yes.

9       Q    And whether or not a search warrant was

10  executed for the defendant's vehicle.

11      A    Yes.

12      Q    And you testified that you did not; correct?

13      A    Right.

14      Q    Could you just explain to the members of the

15  jury why not?

16      A    There was no serious injury at the time of

17  the crime.  And prior to the arrest, one of the

18  vehicles was already vouchered to a prior incident.

19      Q    Well, Detective Faivus, a gun was alleged to

20  have been used in this incident; correct?

21              MR. BRACKLEY:   I am going to object to

22      this, Judge.

23              THE COURT:   Overruled.

24      Q    Is that correct?

25      A    Yes.

                                                      vr

Det. Faivus - People - Recross          56

1     Q    And you agree with me that a gun is

2  dangerous; correct?

3     A    Yes.

4     Q    And even though a gun -- and you had an

5  opportunity to re-observe the video; correct?

6     A    Yes.

7     Q    And you saw that a gun was used in the

8  incident; correct?

9              MS. CHAO:   Objection.

10             THE COURT:   Overruled.

11             MR. BRACKLEY:   Objection.

12             THE COURT:   Overruled.

13    Q    And despite the gun being in the video, a

14  search warrant on the vehicle in the defendant's house

15  was not executed; isn't that right?

16    A    Nope.

17             MS. CHAO: No further questions.

18  RECROSS EXAMINATION

19  BY  MR. BRACKLEY:

20    Q    Now, drawing your attention specifically,

21  Detective, sir, to Defendant's #1A and #1B in

22  evidence, the criminal court affidavit.  You have

23  already recognized -- I'm sorry, it's a sworn

24  statement of yours; correct?

25    A    Yes.

                                        vr

Det. Faivus - People - Recross          57

1      Q    And you were asked whether or not Mr.

2  Vasilis, Mr. Englesbobb or Mr. Brown had an

3  opportunity to do a corroborating affidavit.  Forget

4  about them for one second, you interviewed those men;

5  correct?

6      A    Yes.

7      Q    And with specific reference to your work and

8  your experience, you spoke to them about what

9  happened; correct?

10     A    Yes.

11     Q    Specifically with respect to what happened in

12 an alleged robbery of this; correct?

13     A    Yes.

14     Q    And whatever time you spent with them, you

15 asked them, at some point, what happened and what was

16 taken; correct?

17     A    Yes.

18              MR. BRACKLEY:  I have no further

19        questions.  Thanks.

20              THE COURT:  Anything further, People?

21              MS. CHAO:  No, your Honor.

22              THE COURT:  Thank you, Detective.

23              (Witness exited.)

24              THE COURT:  People, call your next

25        witness.

                                              vr

1          MS. CHAO:  At this time, the People call

2     criminalist Natalia Yanoff to the stand.

3          (Witness entering.)

4          N A T A L I A  Y A N O F F, called as a

5     witness by and on behalf of the People, after

6     having been first duly sworn, was examined and

7     testified as follows:

8          COURT OFFICER:  The People call Natalia

9     Yanoff, Office of the Chief Medical Examiner

10     criminalist.

11          THE COURT:  Please inquire, Counsel.

12          MS. CHAO:  Thank you, Judge.

13     DIRECT EXAMINATION

14     BY MS. CHAO:

15     Q    Good afternoon, Ms. Yanoff.  Ms. Yanoff, can

16     you tell the members of the jury who are you employed

17     by?

18     A    I am employed by the Office of the Chief

19     Medical Examiner for the City of New York Department

20     of Forensic Biology.

21     Q    And, approximately, how long have you been

22     employed -- is the Office of the Chief Medical

23     Examiner also referred to as OCME?

24     A    Yes.

25     Q    And what's your position there?

                                                    vr

1      A     I'm a Criminalist Level 3.

2      Q     And, approximately, how long have you been a

3  Criminalist Level 3?

4      A     Criminalist Level 3 for, approximately, two

5  years.

6      Q     And can you describe your duties and

7  responsibilities as a Criminalist Level 3?

8      A     As a Criminalist Level 3, my duties and

9  responsibilities are to supervise some employees in

10 the laboratory, to supervise evidence examinations

11 relating to property crimes cases, and I also

12 supervise various tests that are performed by some

13 analysts.  I also perform DNA analysis and DNA

14 interpretations and write reports and testify in court

15 as needed, and I also review some cases in the lab.

16     Q     Can you tell the members of the jury a little

17 bit about your training and experience?

18     A     Every analyst is trained in the laboratory on

19 evidence examination and documentation on various

20 techniques that I use in the laboratory and also DNA

21 interpretations and report writing.

22              MR. BRACKLEY:   Judge, if I may, I will

23         accept this witness as an expert, if that's an

24         issue here.

25              MS. CHAO:  I ask that the witness be

                                              vr

1    deemed an expert in forensic biology and DNA

2    testing.

3              MR. BRACKLEY:  No objection, Judge.

4              THE COURT:   Then this Court finds her to

5    be an expert in the field of forensic biology and

6    DNA --

7              MS. CHAO:   Testing.

8              THE COURT:   -- testing.

9              MR. BRACKLEY:  Yes, Judge.

10   Q    Criminalist Yanoff, is the OCME an accredited

11   lab?

12   A    Yes, it is.

13   Q    And what does it mean to be an accredited

14   lab?

15   A    It means that to be accredited and to be a

16   forensic laboratory in New York State, we are required

17   to be accredited.  It means that we have to meet

18   specific standards, and it basically shows that the

19   work that we do is accurate and reliable.

20   Q    Now, can you explain to us what forensic

21   biology means?

22   A    Forensic biology is a part of science that

23   deals with identification of biology material; blood,

24   semen, saliva, skin cells, and try to tell from whom

25   they could have come from using DNA tests.

                                                    vr

1    Q    And can you tell us what DNA is?

2    A    DNA is genetic material that we inherit from

3    our parents.  We get half DNA from the mother and half

4    from the father.  About 99 percent of DNA is the same

5    between all of us and that what's makes us humans and

6    only about 1 percent is different between all of us

7    and that's what makes us individual.

8    Q    And how do you conduct DNA analysis?

9    A    There are several steps in DNA analysis.  The

10   first is we examine evidence and collect biological

11   materials, it could be either biological fluids such

12   as blood, semen or saliva, or it can be just skin

13   cells or hair.  We extract DNA, and extract DNA means

14   we take DNA out of a cell.  The next step would be to

15   determine how much DNA is present in a sample or if

16   it's enough to perform further testing.  And after

17   that step, we perform DNA analysis and determine what

18   alleles are present in the sample if it has enough

19   DNA.

20   Q    Now, directing your attention to December

21   20th of 2007; did the OCME receive property in

22   connection with this case?

23   A    Yes.

24   Q    Do you recall what?

25            THE WITNESS:  Your Honor, may I refer to

                                                      vr

Case 1:15-cv-03686-ENV   Document 14-1   Filed 11/02/15   Page 98 of 165 PageID #: 1795

1      my --

2                   THE COURT:   Please.

3      A     We received White Castle plastic bag and

4    holster.

5      Q     And what condition were they in?

6      A     They were sealed.

7      Q     Were those items vouchered under any specific

8    voucher number?

9      A     Yes, voucher number is N923798.

10     Q     Now, directing your attention to June 6 of

11   2008; did OCME receive additional property in

12   connection with this case?

13     A     Yes.

14     Q     What was that?

15     A     We received water bottle, and we also

16   received a swab from that water bottle.

17     Q     And what voucher number was assigned to the

18   water bottle and swab?

19     A     The voucher number is N923797.

20     Q     And what condition was that in?

21     A     Sealed.

22     Q     And once OCME received those items, did OCME

23   assign a file number?

24     A     Yes.

25     Q     What was the file number that pertained to

                                              vr

1    those three pieces of evidence?

2         A    FB-07-04095.

3         Q    After receiving the evidence in this case,

4    the water bottle, White Castle bag and holster, what

5    did you or OCME do?

6         A    We examined this evidence and we determined

7    that only one sample had enough DNA for further

8    testing.

9         Q    And when you refer to only one sample had

10   enough DNA for testing, what item was that?

11        A    It was the plastic bag.

12        Q    And is it fair to say that the holster and

13   the water bottle had insufficient DNA?

14        A    Yes.

15        Q    And what does it mean to have insufficient?

16        A    Insufficient means not enough to perform

17   further tests.

18        Q    Now, with respect to the plastic bag, was

19   there sufficient DNA for testing?

20        A    Yes.

21        Q    And can you tell us what you did with the

22   bag?

23        A    The bag was examined, and there was -- the

24   areas of the bag were swabbed, meaning that they would

25   take a swab is something like a Q-tip that would wet

                                                  vr

1   it and then rub against the area of the bag to collect

2   skin cells.  So then, those collected cells with a

3   swab would be put in a tube, and the next step would

4   be DNA extraction.  So that DNA was extracted from the

5   sample, then we determined that there was enough

6   quantity in the sample to perform further testing, and

7   the test was done and we determined that there was a

8   mixture in that sample.  Mixture means that more than

9   one person contributed to the sample, more than one

10  person touched that bag, but there was one major

11  donor.  Major means that more of the cells from one

12  person than from other people.  So we could only

13  determine the profile from one individual.

14      Q    And is it also fair to say that the major

15  donor may have touched the bag more than the minor

16  donor?

17      A    Yes.

18      Q    Now, directing your attention to March 13 of

19  2009 -- withdrawn.  Upon receiving the DNA, the

20  sufficient DNA on the bag, did you conduct a DNA

21  analysis?

22      A    Yes.

23      Q    And did there come a time when you or your

24  office notified the NYPD?

25      A    Yes.  When we wrote the report after making

vr

1  the conclusion, we usually fax our reports to the

2  NYPD.

3      Q    And directing your attention to March 13 of

4  2009, did you receive further evidence in connection

5  with this case?

6      A    Yes.

7      Q    What did you receive?

8      A    We received the swab from Richard Collins.

9      Q    Richard Collins?

10     A    Yes.

11     Q    And what was the DNA swab vouchered under?

12     A    It was vouchered under P-585318.

13     Q    And did OCME assign a file number for the

14  swab taken from the defendant?

15     A    Yes.

16     Q    What was that file number?

17     A    FB-09-S-0253.

18     Q    Why was the defendant swabbed?

19     A    So we usually get the swab from individuals

20  to compare to the evidence to include or exclude the

21  individual from the sample.

22     Q    And were you able to make a comparison?

23     A    Yes.

24          MS. CHAO:  Your Honor, if the witness may

25      be shown People's #5 that's premarked for

                                                    vr

1    identification.

2              MR. BRACKLEY:   Judge, I've seen it, and

3    I will not object to its introduction at this

4    point without any foundation.

5              THE COURT:   Then what's been marked

6    People's #5 is now in evidence as People's #5.

7              (Whereupon, People's Exhibit #5, chart,

8    was marked into evidence by the court reporter.)

9    Q    Criminalist Yanoff -- if the court officer

10   may stand --

11             THE COURT:   Or you can use the easel.

12             MS. CHAO:   Thank you, Judge.

13             (Exhibit displayed.)

14   A    This is the chart, blown-up chart from the

15   case file that contains the results for the evidence

16   that was tested on the case, which is a plastic bag

17   and also the DNA profile from Richard Collins.  As

18   I --

19             THE WITNESS:   May I stand up?

20             THE COURT:   Please, yeah.

21             Can you show us again the column or the

22        line that has the result of the bag and the line

23        for the other swabs?

24   A    So on the top of the chart, there are

25   different locations on DNA that were tested.  We don't

                                              vr

1  test entire DNA, we only test 15 locations, and

2  located -- 16 is location that determines the sex of

3  the individual.  So here you would see X and Y, it

4  indicates that the sample is from a male, and X would

5  be from female.  On here, there are names of the

6  samples that were tested.  This is swab of plastic

7  bag, we did our testing in duplicates, so we did the

8  same test twice, so we use this per sample to

9  determine the major donor.  As I already mentioned

10  before that you get half of DNA from the mother and

11  half from the father, so those numbers are called

12  alleles, so basically allele is form of DNA.  So

13  example of an allele could be an eye color, you can

14  have brown, blue, green eyes, and depending on what

15  you inherit from your parents, that's the eye color

16  you're going to get.  But alleles that we test in the

17  laboratory, they represented by the number.  So you

18  would get one number from the mother and one from the

19  father, so you would have only two numbers at each

20  location.  Here we have more than two numbers so it

21  means that there's mixtures.  As I already said, there

22  was a mixture present in the sample.  So those stars

23  mean that those alleles did meet our level of criteria

24  for the make of an allele, so we didn't report -- the

25  allele didn't meet.  So when I determined this major

vr

1  donor profile -- so I didn't look at the table, we

2  actually look at the data and where you can see the

3  major donor and minor alleles that are present.  So

4  based on the actual data that we were able to

5  determine, what profile of the major donor is.  So

6  after profile was determined, there was also DNA

7  profile from the swab that was collected from Richard

8  Collins who also tested and the profile was determined

9  here.  And then, the last step is comparison, so I

10  compared numbers at the same location, you compare 14,

11  15 here, and 14, 15, 28, 34, 2.  Here you see one

12  number 11, 11, so we only put it once that time; one

13  11 was from the mother and 11 was from the father, but

14  otherwise, it's two numbers in each location.  So all

15  the numbers were the same here, I put a Z here means

16  that, at this point, I wasn't sure if this allele came

17  from the minor donor or it was contributed to this

18  profile, so it was just -- it wasn't just given a

19  number.  But all other numbers were the same.  And

20  here you see 25 here, so I compared, and those two

21  profiles were the same.

22      Q     And Criminalist Yanoff, were you able to

23  perform a statistical calculation to determine how

24  rare or how common the DNA profile was generated from

25  the plastic bag from the White Castle bag?

Case 1:15-cv-03686-ENV   Document 14-1   Filed 11/02/15   Page 105 of 165 PageID #: 1802

1    A    Yes.  You would expect to see this profile in

2    one in greater than a trillion individuals.  And to --

3              THE COURT:    A trillion? T-r-i-l-l-i-o-n?

4              THE WITNESS:    Trillion.

5              THE COURT:    Okay.

6              THE WITNESS:    And to better understand

7         the number, if there are about six-and-a-half

8         billion people on planet Earth, you would need

9         about 166 planet Earths with the same number of

10        people in each planet and you would expect to see

11        this profile only once.

12   Q    And Criminalist Yanoff, were you able to

13   render an expert opinion, to a reasonable degree of

14   scientific certainty, as to whether or not the major

15   donor profile that was taken from the White Castle bag

16   matched the Richard Collins DNA swab?

17   A    Yes.

18   Q    And what was that conclusion?

19   A    That it matched.  With a degree of scientific

20   certainty, this profile came from Richard Collins.

21   Q    And just for the record, the chart that's

22   submitted into evidence, People's #5, is that a chart

23   that you compared blown-up by the DA's office?

24   A    Yes.

25   Q    And when you were evaluating the three pieces

vr

Proceedings                          70

1   of evidence, which is the White Castle bag, the

2   holster and the water bottle, to determine whether or

3   not there was sufficient DNA, did you also -- were you

4   also able to determine whether or not there was blood

5   on any of those three items?

6       A    There was no blood on any of the items.

7                MS. CHAO:    No further questions, Judge.

8                MR. BRACKLEY:    Judge, I have no

9         questions of this witness.

10               Thank you.

11               THE COURT:    Thank you, Ma'am.

12               (Witness exited.)

13               People any further witnesses?

14               MS. CHAO:    No, Your Honor.

15               Your Honor, at this time, the People

16        rest.

17               THE COURT:  With those words, the People

18        rest.   There'll be no further evidence offered by

19        the People in support of the charges against the

20        defendant.

21               I had mentioned to you, when we had first

22        met, that we will not be in session Friday of last

23        week.   I didn't realize that we would not be in

24        session two Fridays, meaning Friday of last week

25        or tomorrow, so this case is being adjourned to

                                                          vr

Proceedings                    71

1    Monday morning; at that point, we will find out
2    whether or not there will be a defense case.  But
3    in either event, what I expect to happen Monday is
4    that we will be in a position to hear summation of
5    counsel and you'll be charged as far as the law is
6    concerned. So, at this time, there's nothing more
7    for us to do for you today.
8           Thank you for being patient with me in
9    the process of waiting and working into this
10   evening.  But have a great day tomorrow and a good
11   weekend, and see you Monday morning at 9:30.
12           (Jury exited.)
13           THE COURT:   Anything further, counsel?
14           MR. BRACKLEY:   No, Judge.  Thank you.
15           With the exception of -- just for the
16   purposes of the record, I believe the situation is
17   Detective Faivus is about one inch from his death
18   bed today, he's apparently not feeling very well.
19   There was a time where he made a mention of a
20   Queens house, and then I think that the car didn't
21   need to be search because it was -- there was a
22   subject of a prior incident.  Now, I believe that
23   this jury, the way he said it, and the assistant,
24   to be fair to her and to what I believe happened
25   here, this detective didn't do that in any

                                              vr

1    malicious way nor was it elicited in any purpose.

2    I believe he said it not really aware of what his

3    circumstances were.  And I think, Judge, the best

4    remedy, because I think it will only enhance the

5    jury's memory of it and to bring to their

6    attention, that those two things be stricken from

7    the record, and I would make no other applications

8    at this point.

9              THE COURT:  Although, if memory serves,

10   the answer given was responsive to the question

11   asked.  I think that the question asked was why

12   you didn't search the car, and I think that that

13   is all part of the answer that he gave, it was

14   already vouchered in an unrelated matter.

15             MR. BRACKLEY:  Prior incident.

16             THE COURT:  Correct.  So it was

17   responsive to the question asked.  And as you

18   mentioned, I don't think the answer was, in any

19   way -- there was an intention to adversely effect

20   the defendant, and it was not elicited for that

21   reason.  But the answer was reasonable, you know,

22   given the question asked, so I don't see any

23   reason to strike it at this point.

24             MR. BRACKLEY:  Okay, Judge.

25             MS. CHAO:  Your Honor, I mean, as to the

                                              vr

1       portion that "it was vouchered for a previous

2       incident", I don't have a problem striking that

3       portion, only because when the People did speak to

4       the detective prior to taking the stand, part of

5       his answer was that the victim did not sustain

6       enough serious injuries and he didn't bother

7       executing a warrant for the house or the car, and

8       on the stand, he added the additional element, the

9       fact that it was vouchered in a previous incident;

10      and, therefore, I have no problems striking that

11      portion because that was not the testimony that I

12      attempted to elicit from the officer or detective.

13      When he, in fact, stated that, I tried to not have

14      him provide any further detail as to that.

15              THE COURT:   Okay.   Then we're in the

16      effort -- certainly the option could have been to

17      lead him more directly around that minefield.

18              Given the fact that there is a consent by

19      the People, then that portion of the answer,

20      meaning, I think it was that the car had been --

21              MS. CHAO:   That the car was vouchered in

22      a previous incident.   So it was part of his

23      testimony as to why he didn't execute a search

24      warrant, so I just ask that --

25              THE COURT:   So that part of the answer of

                                                   vr

Proceedings                              74

1      the car -- because the car was vouchered in

2      connection with a prior incident, will be

3      stricken.

4                  MR. BRACKLEY:   Thank you, sir.

5                  MS. CHAO:   Thank you, Judge.

6                  THE COURT:   See you Monday.

7                  (Whereupon the trial was adjourned to

8      Monday, August 3rd, 2009.)

9                  ***********************************.

10     CERTIFIED TO BE A TRUE AND ACCURATE TRANSCRIPT OF THE
       ORIGINAL STENOGRAPHIC MINUTES TAKEN OF THIS
11     PROCEEDING.

12

13

14                 VANESSA REYES
                   Senior Court Reporter

15

16

17

18

19

20

21

22

23

24

25

                                                      vr

75

1               INDEX TO WITNESSES

2                        Direct  Cross  Redirect  Recross
  For the People:

3

4  PO Greg Leavey          2       11      18        20

5  Det. Joseph Faivus      22      34      45      52

6  Natalia Yanoff          54

7

8

9               INDEX TO EXHIBITS

10                  Identification      Evidence

11  For the People:

12  5- DNA Blow up Chart                      61

13

14  For the Defendant:

15  A - Affidavit of Det. Faivus    39

16

17

18

19

20

21

22

23

24

25

                                        vr

1

1   SUPREME COURT OF THE STATE OF NEW YORK

COPY

2   COUNTY OF QUEENS: CRIMINAL TERM : PART   K-20

3   ---------------------------------------x

4   THE PEOPLE OF THE STATE OF NEW YORK,    Indictment:
                                            1820-08
5                       -against-

6   RICHARD COLLINS,

                                        TRIAL
7                       Defendant(s).

8   ---------------------------------------x

9                       125-01 Queens Boulevard
                        Kew Gardens, NY 11415
10                      July 22, 23, 27, 28, 29, 30, 2009
                        August 3, 4, 5, 2009
11

12  B E F O R E:

13          HONORABLE RONALD S. HOLLIE,
                  J U S T I C E
14

15  A P P E A R A N C E S:

16          RICHARD A. BROWN, ESQ.
            District Attorney, Queens County
17          BY:   ROSEMARY CHAO, ESQ.,
            Assistant District Attorney
18          For the People

19          PATRICK BRACKLEY, ESQ.,
            Atty. For the Defendant
20          222 Broadway
            New York, New York
21

22

23

24                      LYNNETTE Y. CRUZ, RPR, CRR
                        Senior Court Reporter
25

2

Proceedings

1          THE COURT CLERK:  Calendar number 4, indictment

2     number 1820 of 2008, People versus Richard Collins.

3          MS. CHAO:  For the People, Assistant District

4     Attorney Rosemary Chao.

5          Good morning, your Honor.

6          MR. BRACKLEY:  Patrick Brackley, 222 Broadway,

7     New York, New York, for Richard Collins.

8          Good morning, Judge.

9          THE COURT:  Good morning.  The defendant is here

10     present in very colorful clothing.  I imagine it's not trial

11     ready clothing.

12          MR. BRACKLEY:  That's correct, Judge.  For the

13     record, his wife, actually, who is very on top of her

14     situation here, called me yesterday and said that they

15     didn't mark his card trial.  He did everything he could last

16     night and this morning to come here with a suit and they

17     refused to let him take it, so he's in the position where I

18     don't know, Judge, what the alternative would be since I

19     think -- I don't think I can pick a jury with him looking

20     like that.

21          THE COURT:  That's accurate and fair.  What we can

22     do then, I will handle the preliminary matters that we

23     planned to anyway today, and adjourn the matter further for

24     trial tomorrow, making sure that the card is marked

25     appropriately and --

Proceedings

1      MR. BRACKLEY:  Judge, for the record, maybe we can

2    take care of the Antommarchi situation.

3      THE COURT:  Absolutely.

4      MR. BRACKLEY:  Judge, Mr. Collins knows that we

5    are about to pick a jury tomorrow.  He knows that he has the

6    right to be present at every sidebar conference with respect

7    to -- during the voir dire.  Having been before this

8    honorable court before, I know that if jurors have questions

9    they approach the bench.  Mr. Collins has a right to be

10   there.  He's going to waive that right to be present at the

11   bench with a juror who has an issue or a prejudice or a

12   problem.  He knows I will be there and I will report

13   everything to him.

14      Generally, a juror without the presence of the

15   defendant at the bench is generally more forthcoming and I

16   think that it would be in his best interest to do that and

17   he thereby waives that right.

18      THE COURT:  That waiver, there's form we have,

19   sir.  If you will just read through that form and make sure

20   that you understand everything on it.  If you have any

21   questions ask your attorney sitting next to you.

22      (Whereupon, there is a brief pause in the

23   proceedings.)

24      MR. BRACKLEY:  Judge, the waiver has been executed

25   and I'm going to pass it up.

4

Proceedings

1        THE COURT:  Mr. Collins, I have in my hand a form

2   called Waiver of Defendant to Be Present At Side Bar

3   Conferences.  This is a form that I saw you sign in my

4   presence.  Prior to signing it did you read it?

5        THE DEFENDANT:  Yeah.

6        THE COURT:  Anything in this form that you did not

7   understand, and you discuss with your attorney sitting next

8   to you?

9        THE DEFENDANT:  Yeah.

10        THE COURT:  You also heard him mentioning to me

11   his conversations with you, your understanding of what your

12   rights are as far as being present during the sidebar bench

13   conferences during voir dire and you are waiving your right

14   to be present, is that the fact?

15        THE DEFENDANT:  Yes.

16        THE COURT:  Court feels there has been a knowing

17   and intelligent waiver of the defendant's right to be

18   present during the sidebar conferences, noting that this

19   day, July 22nd.

20        Mr. Brackley, it's the 22nd, correct?

21        MR. BRACKLEY:  Yes, Judge.

22        THE COURT:  Another matter that had to be

23   discussed, I understand the defendant has had prior arrests,

24   and so there may be a Sandoval issue.

25        People, should the defendant choose to testify,

lyc

5

Proceedings

1   what would you wish to cross-examine him about relative to

2   those past arrests?

3              MS. CHAO:   Your Honor, in the event that the

4   defendant were to testify, People would be seeking to ask

5   the following, and I will start in chronological order with

6   his May 27th, 1996 arrest.

7              THE COURT:   Counsel, if you would, would you start

8   with the most recent going back in time.

9              MS. CHAO:   Judge, starting, with the January 17,

10  2007 arrest, the People would be seeking to go into the

11  following, that on May 7th, 2007, he pled guilty to

12  disorderly conduct, which is a violation and received $100

13  fine; and we also would be seeking to go into the underlying

14  facts as of that case as follows:

15             On January 17, of 2007, at approximately 6:10

16  A.M., at 1209 Astoria Boulevard, pursuant to a search

17  warrant, the defendant was in possession of a knife as well

18  as cocaine and a scale.

19             Also for his December 23rd 1999 arrest, we would

20  be seeking to go into --

21             THE COURT:   Counsel, going back to that or staying

22  for the moment on that 1/17/07 arrest, the execution of the

23  search warrant was it at his home or the home of someone

24  else?

25             MS. CHAO:   Judge, the defendant has a couple of

Proceedings

1    addresses, and it's my understanding that at the time that

2    the defendant was arrested, the address that he gave to

3    parole and the address in which he was arrested differs, but

4    that address is in the vicinity of where he lives, so it's

5    the People's position that we believe it was a residence

6    where he was staying at.

7            THE COURT:  Okay.

8            MS. CHAO:  For his December 23rd, 1999 arrest,

9    People would be seeking to go into the fact that on November

10   8 of 2000, he pled guilty to Burglary in the Second Degree,

11   which is a class C felony and he received five years

12   incarceration and he's currently on parole until December

13   17th, of 2009, and the underlying facts for that case are as

14   follows:

15           That on December 23rd, 1999, at approximately 6:40

16   P.M., at 12-07 Astoria Boulevard, the defendant held a gun

17   to complainant Jennifer Hollander's head and punched her

18   several times in the face.

19           In addition, he forced himself into her apartment,

20   threatened her and was tapping the gun across her face.  She

21   ran and he shot at her, and rounds were recovered at the

22   scene and a hole that appeared to be a bullet hole was

23   observed in the living room floor.

24           Also for his October 25th, 1997 arrest, the fact

25   that on January 26th, 1998, he pled guilty to Assault in the

Proceedings

1    Second Degree, which is a class D felony, the underlying

2    facts for that case are as follows:

3              That on September 15, 1997 at approximately 937

4    hours at Astoria Boulevard and 14th Street, he struck

5    complainant Frank Shane in the head with a wooden board

6    causing the complainant to sustain injuries as well as

7    stitches.

8              Also for his September 18, 1997 arrest, the fact

9    that he pled guilty on March 19, 1990, to Assault in the

10   Third Degree, which is a class A Misdemeanor, in which he

11   received one year incarceration and the facts for that case

12   are as follows:

13             September 15, of 1997, at approximately 900 hours,

14   off Kings Street and Astoria Boulevard, the defendant struck

15   complainant Wesley Flipping several times in the face

16   causing injuries to his ear and lip.

17             Lastly, for his May 27, 1996 arrest --

18             THE COURT:  You know, Counsel, relative to that

19   September 18, 1997 offense, arrest in the striking of this

20   person in his face, was there a weapon used?

21             MS. CHAO:  Judge, the printout from the DA's

22   office doesn't indicate a weapon, so all I have is that he

23   struck the complainant, but there is no indication as to

24   whether or not a weapon was in fact used.

25             THE COURT:  I'm just looking at his sheet and it

Proceedings

1    seems that he was arraigned on the charges of assault with a
2    weapon and the possession of a weapon.  I was just wondering
3    whether or not that's the arraignment charge.

4            MS. CHAO:  Judge, when the People had reviewed the
5    previous cases because this dates back to 1997, the records
6    are void of the actual complaint and accusatory instrument,
7    so what I have is the arrest report, and based upon the
8    arrest report, it just indicates striking, but not whether
9    or not a weapon was in fact used.

10           THE COURT:  Okay.

11           MS. CHAO:  Lastly, for his May 27, 1996 arrest, he
12   pled guilty on August 23rd, 1996, to attempted Burglary in
13   the Third Degree, which is a class E felony, and was
14   sentenced to six months incarceration, five years probation.
15   He violated probation and then was subsequently resentenced
16   to nine months incarceration.  For that case, the facts are
17   as follows:

18           That on May 27, 1996, at approximately 4:20 A.M.,
19   at 1209 Astoria Boulevard, at a commercial location called
20   GG&N Aluminum Siding, the defendant entered the rear door
21   and removed property.

22           The People would not be seeking to go into the
23   underlying facts of his youthful offender adjudication in
24   which -- in which he pled guilty to attempted Robbery in the
25   Third Degree and that was for his January 3rd, 1996 arrest.

Proceedings

1        It's the People's position that in the event that

2    the defendant were to testify this demonstrates that he puts

3    his interest above that of society.

4        THE COURT:  Mr. Brackley, relative to the 1997

5    arrest, the striking of the complainant in the face, I don't

6    know yet, obviously, what the People will eventually find

7    was or was not a weapon, but to your client's memory, is it

8    his position that there was never a weapon used?

9        MR. BRACKLEY:  That's correct, Judge.

10        THE COURT:  Okay.  Mr. Brackley, again going over

11    those items from the most recent back in time, what say you

12    relative to the 1/17/07 arrest.

13        MR. BRACKLEY:  Judge, I would request that with

14    respect to each and everyone of the convictions which is the

15    only information that I would argue has any relevance with

16    respect to Sandoval, the individual is no longer on parole,

17    the defendant, and I think the record so states that, that

18    he was taken off supervised release pursuant to one of those

19    court decisions is that only that he has a felony and the

20    date of conviction.

21        I believe, Judge, in this particular case any of

22    the facts, those being violent acts involving weapons would

23    be overly prejudicial, whatever probative value it has into

24    his ability to tell the truth or not.  I think if this jury

25    finds out he has a felony, the title of, whether it's

Proceedings

1    burglary or assault and the date of the conviction, I

2    believe that would be sufficient to let this jury evaluate

3    his credibility but any facts that would be somewhat similar

4    or consistent with this case, I think, Judge, whatever

5    probative value it has to his ability to tell the truth or

6    not would be substantially outweighed by the prejudice that

7    would apply to him in front of this jury.

8            THE COURT:  People, if you will, for the record,

9    indicate to me what the underlying facts of this case are?

10           MS. CHAO:  Judge, the underlying facts of this

11   case are pretty much that on December 13, of 2007, at

12   approximately 4:30 A.M. at the White Castle in Astoria,

13   Queens, the complainant were at the restaurant eating and

14   playing cards.  The defendant approached them, was touching

15   their cards, started inquiring as to their background, a

16   dispute occurred and the defendant threw water at one of the

17   complainants and when that complainant got up, the defendant

18   struck him in the face and then a fight began, and after the

19   defendant fought with the complainant, the defendant

20   subsequently left the restaurant, went to his car, retrieved

21   a gun, came back into the restaurant.  The individual who he

22   had fought with fled the store, his two friends remained in

23   the store and defendant attempted to rob one of the

24   complainants that was inside the store by demanding

25   property, and then the defendant cocked his gun.  The other

Proceedings

1    friend was inside the store, didn't want his friend to get

2    hurt, so basically distracted the defendant and then went

3    after him, demanded property and took his chain and wallet

4    and then fled the location.  Police were called.

5            What was left at the location was a White Castles

6    bag that the defendant was carrying, where there is a DNA

7    hit and subsequently a few minutes later when the DNA hit

8    popped up, the officer then placed the defendant under

9    arrest, and a line up was subsequently conducted and the

10   complainants positively identified the defendant.

11           There's no weapons recovered in this case, there's

12   no stolen property recovered in this case, and there is a

13   video surveillance depicting the incident that occurred at

14   the White Castles and from the angle of the video

15   surveillance, because the defendant has his back turned to

16   the video surveillance, it's difficult to see the taking of

17   the property, but the video clearly depicts him on the video

18   with the silver gun approaching the two individuals in the

19   White Castles as well as the fight that occurred earlier.

20           THE COURT:  Also, People, relative to the 12/23/99

21   arrest, also, the '97 arrest in which a male was struck in

22   the head and then the other '97 arrest, in which the

23   complainant was struck in the face, in either of those three

24   cases, were the people who were struck, were the

25   complainants known to the defendant or were they strangers?

12
Proceedings

1           MS. CHAO:  Judge, the arrest reports that I have

2      do not indicate a relationship.  For the earlier cases, the

3      1997 case, the computer wasn't updated at that point.  For

4      the 1999, with Jennifer Hollander, I can double check.  The

5      People had requested the records, but unfortunately the

6      records from the record room are unavailable, but just based

7      on the arrest report itself, it does not indicate a

8      relationship.

9           THE COURT:  The '97 cases were both Queens County

10     cases?

11          MS. CHAO:  Yes.

12          THE COURT:  Separated by about five weeks?

13          MS. CHAO:  That's correct.  The 114 Precinct is in

14     Queens County and they are Queens County dispositions.  All

15     three of them are Queens County cases because we had

16     attempted to order the records, but the record room is

17     having difficulty locating the file, so based upon People's

18     retrieval of the arrest reports as well as whatever was on

19     the computer, whatever was up to date at the time, 1997 are

20     unavailable and I will review the 1999 just to double check

21     to make sure much.

22          THE COURT:  Mr. Brackley, would you care to say

23     anything further?

24          MR. BRACKLEY:  No, Judge, thanks.

25          THE COURT:  Starting first with the 1/17/07

lyc

Proceedings

1    arrest, should the defendant choose to testify, then the

2    People will not be able to inquire as to the underlying

3    facts of that offense.  He pled guilty to a disorderly

4    conduct.  It would seem that going into the underlying

5    offense would be disproportional to the crime that he

6    actually pled to and not fair.  So the People will not be

7    able to inquire as to any aspect of that arrest.

8         As to the 12/23/99 arrest, the People will be

9    allowed to inquire of the defendant if he had been convicted

10   of a burglary that involved a home, but not go any further

11   into the underlying facts, including not going into the fact

12   that he possessed a loaded firearm or fired that firearm.

13        As to the 10/25/97 arrest, the People will be

14   allowed to inquire as to the fact that there was a

15   conviction for assault.  The underlying facts of that

16   assault.  I'm sorry, relative to the 10/25/97 arrest, the

17   People will be allowed to inquire as to the fact that there

18   was a conviction, that it was to Assault in the Second

19   Degree, but not go into the underlying facts of that

20   offense.

21        As to the 09/18/97 arrest, the People will be

22   allowed to inquire as to the fact that it was a plea to an

23   assault and go into the underlying facts of that offense.

24        As to the 07/27/96 arrest, that was the commercial

25   burglary, the People will be allowed to go into the fact

Proceedings

14

1    that he was convicted of an attempted burglary, but not go

2    into the underlying facts of that offense.

3                MS. CHAO:  Your Honor, just for clarification with

4    respect to the ones that I'm allowed to go into the

5    convictions of, can I specify as to whether or not they are

6    misdemeanors and felonies?

7                THE COURT:  Yes.

8                MS. CHAO:  And with respect to the most recent

9    arrest, which is the January 17 of 2007, you indicated that

10   I would not be able to go into the underlying facts, but

11   would I be able to go into the fact that he pled guilty to

12   disorderly conduct?

13               THE COURT:  No.

14               MS. CHAO:  Thank you, Judge.

15               THE COURT:  And you will not be allowed to inquire

16   as to the youthful offender adjudication or the underlying

17   facts of that offense.  I think that covers all the matters.

18               MS. CHAO:  Yes, your Honor.

19               THE COURT:  Exceptions from the defense?

20               MR. BRACKLEY:  No, Judge.

21               I need a witness list, People.

22               MS. CHAO:  Judge, I'm going to hand up to the

23   Court the witness list as well as a list of the Rosario that

24   was previously provided to Mr. Brackley; and I'm also

25   handing to Mr. Brackley a witness list.

Proceedings

1      Also, just one thing, there was a corrected DNA

2   sheet that I'm going to give to Mr. Brackley as well.

3      Judge, for the record, two of the three

4   complainants have criminal records, Corinthian Brown has two

5   Misdemeanor convictions.  He pled guilty on June 30, 2005 to

6   Criminal Contempt in the Second Degree, which is a class A

7   Misdemeanor, and on 2/30/2005 he received 60 days

8   incarceration.

9      On August 16 of 2004, he pled guilty to Assault in

10   the Third Degree, class A Misdemeanor, and on August 16 of

11   2004, he received 30 days incarceration as well as three

12   years probation.

13      With respect to the other complainant, Perickles

14   Vasilaropoulos, he, after a trial on November 3rd, 1995, he

15   was convicted of Robbery in the First Degree, and on

16   November 3rd of 1995, he was sentenced to 6 to 18 years

17   incarceration.

18      With respect to the third complainant, Anthony

19   Englesbobb he has no criminal record.

20      MR. BRACKLEY:  Judge, if I could just request of

21   the People the docket numbers of those cases and I realize

22   in the discovery material that was turned over yesterday

23   timely, of course, that there are names of some employees

24   from White Castle as to whether or not the People have any

25   contact information on them or not because they don't appear

Proceedings

1    to be on the witness list.

2              MS. CHAO:   We don't have contact information with

3    respect to those witnesses.   It's my understanding that they

4    are no longer employed with the company.   The only person

5    that is employed is an individual by the name of Tameka

6    Greene, I believe, but she was not an eyewitness to the

7    incident.   She was just the store manager, and in the event

8    that Mr. Brackley would require their last known addresses,

9    I could make an inquiry, but I have no contact information

10   as to them.

11             MR. BRACKLEY:   Judge, I would just request if

12   possible that the People get me the last known address of

13   this Beleziar and that Tameka individual, if possible.

14   Otherwise, Judge, I will have a subpoena here in any event

15   for the White Castle corporation to get that information.

16             MS. CHAO:   Yes, your Honor.

17             THE COURT:   Now, would there be any -- there

18   shouldn't be any delays as far as the trial is concerned.

19   White Castle's response to that subpoena, whether or not

20   they respond timely or not, is not going to delay the trial.

21             MR. BRACKLEY:   No, Judge.   I think the People can

22   help me with that and I will do what I need to do to get

23   them.   I think, Judge, we pick tomorrow, we have Friday off,

24   so I have several days in the weekend to do what I need to

25   do.

Proceedings

1        THE COURT:  Sylvia Babilonia?

2        MS. CHAO:  She is the District Manager.  She was

3   not an eyewitness to the incident, but she is familiar with

4   the video surveillance and is just going to testify as to

5   the layout of the location and the video equipment, but she

6   is not an eyewitness to the incident and just for the

7   record, the documents that Mr. Brackley received were the

8   White Castles file pertaining to this case that she had

9   provided to me -- she provided to me on Monday.

10       THE COURT:  Mr. Brackley and Miss Chao, approach,

11  please.

12       (Whereupon, a discussion was held at the bench,

13  off the record.)

14       THE COURT:  We have now handled, I believe, all of

15  the preliminary matters as was made clear on the record

16  earlier.  The defendant does not have his clothes here

17  today, an efforts will be made, certainly on our part, to

18  make sure that corrections knows this is a trial matter and

19  that he has to be here in his chosen trial clothes tomorrow.

20       MR. BRACKLEY:  Judge, there was some remark that

21  there were some clothes in the building, but Mr. Collins

22  only wears Versaci, so we will have him with his clothes

23  tomorrow.

24       THE COURT:  With that said, nothing more for us to

25  do as far as this trial matter is concerned.  This matter is

Proceedings

1    adjourned to 10:00 tomorrow morning.

2                    MS. CHAO:   Thank you, your honor.

3                    MR. BRACKLEY:   Thank you, your Honor.

4                    (Whereupon, the case is adjourned to July 23,

5    2009, at 10:00 A.M.)

6                    (Continued on next page.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1   SUPREME COURT OF THE STATE OF NEW YORK

 2   COUNTY OF QUEENS: CRIMINAL TERM : PART   K-2

 3   -------------------------------------x

 4   THE PEOPLE OF THE STATE OF NEW YORK,    Indictment:
                                                 1820-08
 5                    -against-

 6   RICHARD COLLINS,
                                             TRIAL
 7                    Defendant(s).

 8   -------------------------------------x

 9                        125-01 Queens Boulevard
                          Kew Gardens, NY 11415
10                        July 23, 2009

11
     B E F O R E:
12
                    HONORABLE RONALD S. HOLLIE,
13                       J U S T I C E

14
     A P P E A R A N C E S:
15
                    RICHARD A. BROWN, ESQ.
16                  District Attorney, Queens County
                    BY:   ROSEMARY CHAO, ESQ.,
17                  Assistant District Attorney
                    For the People
18
                    PATRICK BRACKLEY, ESQ.,
19                  Atty. For the Defendant

20

21

22

23
                        LYNNETTE Y. CRUZ, RPR, CRR
24                      Senior Court Reporter

25
```

1          THE COURT CLERK:  Calendar number 5, case on trial

2     indictment number 1820 of 2008, People versus Richard

3     Collins.

4          THE COURT:  Both sides ready?  The panel is

5     outside.

6          MR. BRACKLEY:  Yes, Judge.

7          MS. CHAO:  Yes, your Honor.

8          THE COURT OFFICER:  Panel entering.

9          (Whereupon, a panel of prospective jurors enters

10    the courtroom and is sworn en mass.)

11         THE COURT CLERK:  So sworn.  You may be seated.

12         THE COURT:  Good morning and welcome, jurors to

13    Part K 20.  I am Ronald D. Hollie and I am the Justice of

14    the Supreme Court who has been assigned to preside over the

15    trial of this criminal case.  You have each been assembled

16    here to participate in the process of jury selection in a

17    criminal case.  The name of this case is the People of the

18    State of New York against Richard Collins.

19         We select a jury by asking jurors questions.  The

20    purpose of questions is to select from among you a jury

21    which will be fair and impartial to the defendant and to the

22    People of the State of New York.  The purpose of the

23    questions is not to embarrass you or to unnecessarily pry

24    into any private areas of your lives.

25         The jury selection process is often called voir

1    dire, which is a French term which means to speak the truth.

2    You must each give a truthful answer to all questions asked

3    of you by myself and by the attorneys.  If you are

4    uncomfortable giving a truthful answer in open court, you

5    may signal me for asking by what's called a sidebar.  At

6    that point I will invite you to approach me and share your

7    answers with only me and the attorneys, out of the hearing

8    of your fellow prospective jurors.

9            The title of this case is People of the State of

10   New York against Richard Collins.  The People in this case

11   is represented by Miss Rosemary Chao, an Assistant District

12   Attorney, Queens County.

13           MS. CHAO:  Thank you, Judge.  Good morning, ladies

14   and gentlemen.

15           THE COURT:  The defendant is Richard Collins and

16   he's represented by his attorney, Mr. Patrick Brackley.

17           MR. BRACKLEY:  Good morning, ladies and gentlemen.

18           THE COURT:  Now, we are here because the defendant

19   has been indicted, meaning he has been charged by a Queens

20   grand jury with several crimes.  The number of crimes that

21   he has been charged with are four in number, each of the

22   crimes is represented by a count, a separate count in the

23   indictment, so there are four counts in the indictment and I

24   will read that to you now.

25           The first count, the first charge, the grand jury

Voir Dire

```
 1    of the County of Queens by this indictment accuse the

 2    defendant of the crime of Robbery in the First Degree

 3    committed as followings:

 4             The defendant, on or about December 13, in the

 5    year 2007, in the County of Queens forcibly stole certain

 6    property to wit personal property from Anthony Englesbobb

 7    and in the course of the commission of the crime or in

 8    immediate flight therefrom he displayed what appeared to be

 9    a firearm.  Subject matter of this count being an armed

10    felony as that term is defined in Section 120 of the

11    Criminal Procedure Law.

12             The second count, grand jury of the County of

13    Queens by this indictment accuse the defendant of the crime

14    of attempted Robbery in the First Degree committed as

15    followings:

16             The defendant on or about December 13, in the year

17    2007, in the County of Queens, forcibly attempted to steal

18    certain property to wit personal property from Corinthian

19    Brown and in the course of the commission of the crime or in

20    immediate flight therefrom, displayed what appeared to be a

21    firearm.  Subject matter of this count being armed felony as

22    that section is defined in section 120 of the CPL.

23             Third count, grand of the County of Queens, by

24    this indictment accuse the defendant of the crime of Assault

25    in the Third Degree comitted as follows:
```

Voir Dire

1        The defendant, on or about December 13, in the

2    year 2007, in the County of Queens, with intent to cause

3    physical injury to Anthony Englesbobb caused such injury to

4    Anthony Englesbobb.

5        The fourth and final count, the grand jury of the

6    County of Queens by this indictment accuse the defendant of

7    the crime of Assault in the Third Degree committed as

8    follows:

9        The defendant, on or about December 13, in the

10   year 2007, in the County of Queens, with intent to cause

11   physical injury to Perickles Vasilaropoulos caused such

12   injury to him.  Those are the four counts of the indictment.

13       What will happen at this point is that our part

14   clerk, Mr. Al Blake, will randomly draw the name of 14

15   prospective jurors.  They will each be seated in the jury

16   box to my right.  Questions will be asked only of the jurors

17   in the jury box, but the questions will be loud enough all

18   for you to hear.

19       For those of you not initially called to the jury

20   box listen and pay attention to the questions asked because

21   before jury selection is over, many if not all of you will

22   be called to that jury box and asked similar questions.

23       THE COURT CLERK:  Juror number 1, Tamara Williams.

24   T-A-M-A-R-A.  Last name W-I-L-L-I-A-M-S.  Juror number 2,

25   Alberto Marin.  A-L-B-E-R-T-O.  Last name.  M-A-R-I-N.

Voir Dire

```
 1    Juror number 3, Cleo Lee.  Last name Lee.  L-E-E.  First
 2    name Cleo.  C-L-E-O.  Juror number 4, Mark Hoffman.  Juror
 3    number 5, Dahyen Chiu.  Last name C-H-I-U.  First name,
 4    D-A-H-Y-E-N.  Juror number 6, Eric Weinstein.
 5    W-E-I-N-S-T-E-I-N.  First name, E-R-I-C.  Seat number 7,
 6    Siddiqua Perbeen.  Last name, P-E-R-B-E-E-N.  First name
 7    S-I-D-D-I-Q-U-A.  Seat number 8, Gloria Williams.
 8    W-I-L-L-I-A-M-S.  First name, G-L-O-R-I-A.  Juror number 9,
 9    Sonia Fortunogolos.  F-O-R-T-U-N-O-G-O-L-O-S.  Sonia,
10    S-O-N-I-A.  Juror number 10, Jennifer Jaranillo.
11    J-A-R-A-N-I-L-L-O.  Juror number 11, Eric Sabella.  Last
12    name, S-A-B-E-L-L-A.  First name Eric.  Juror number 12,
13    Juan Desantes.  D-E-S-A-N-T-E-S.  First name, Juan, J-U-A-N.
14    Juror number juror number 13, Joann Derosa.  Last name
15    D-E-R-O-S-A.  First name, J-O-A-N-N.  Juror number 14,
16    Lauren Paroulek.  P-A-R-O-U-L-E-K.  First name, Lauren.
17    L-A-U-R-E-N.
18              THE COURT:  Good morning again, jurors.  Jurors,
19    this is the first part of your participation in this trial
20    in which I will be asking a series of questions.  The first
21    series of questions have nothing to do with the
22    questionnaires in your hand.  They are questions that I will
23    ask you from here, meaning I will ask those questions of you
24    verbally and I will need you each to give me a loud yes/no
25    answer to the questions.
```

Voir Dire

```
 1              Let's start with the question I normally find to
 2      be the easiest.  Is it fair to say that you are each over 18
 3      years old?
 4              (Whereupon, the prospective jurors respond yes. )
 5              THE COURT:  I will also note with your first
 6      answer, the very muted yes, that I need you each to be
 7      louder in the answers you give.  I'm looking at 14 separate
 8      faces.  I need to hear each of your answers.  So let's try
 9      that first question again.
10              Is it fair to say folks that you are each over 18
11      years old?
12              (Whereupon, the prospective jurors respond yes. )
13              THE COURT:  Mr. Chiu, I'm not sure -- you have a
14      squint in your eye as if you don't understand what I'm
15      saying.
16              PROSPECTIVE JUROR:  Not all of them.
17              THE COURT:  Okay.  Counsel, consent?
18              MR. BRACKLEY:  Yes, sir.
19              MS. CHAO:  Yes, your Honor.
20              THE COURT:  Thank you, sir.  I will excuse you.
21              THE COURT CLERK:  Juror number 5, Lisa Wilson.
22      W-I-L-S-O-N.  First name, L-I-S-A.
23              THE COURT:  Good morning, Miss Wilson.
24      Miss Wilson, while I can guess the answer, I need your
25      answer, are you over 18 years old?
```

Voir Dire

1           PROSPECTIVE JUROR:  Yes.

2           THE COURT:  Back to the entire panel, are you each

3      residents of Queens County and citizens of this country?

4           (Whereupon, the prospective jurors respond yes. )

5           THE COURT:  Have either of you ever been convicted

6      of a felony?

7           (Whereupon, the prospective jurors respond no.)

8           THE COURT:  Are you each able to read and

9      understand English?

10          (Whereupon, the prospective jurors respond yes.)

11          THE COURT:  Now, again, Mr. DeSantes, I haven't

12     heard your voice.  I didn't see your lips move.  Did you

13     understand everything I said so far?

14          PROSPECTIVE JUROR:  If it's complication, no, but

15     I can understand.

16          THE COURT:  Approach please, sir.  Come up.

17          (Whereupon, the following discussion

18     takes place at sidebar.)

19          THE COURT:  As I mentioned to the entire panel,

20     it's very important both to the two sides in this trial and

21     also to you as a juror, that you understand everything

22     that's happening in this room, meaning everything that's

23     said, everything that's done, so in asking you if you

24     understood everything that I have said so far, did I

25     understand --

Voir Dire

1        PROSPECTIVE JUROR:  The thing that you said, yes.

2        THE COURT:  Have you literally understood every

3    word that I have said so far from the time you walked in

4    this room and I starred speaking to the questions that I'm

5    asking now, did you understand every word I said?

6        PROSPECTIVE JUROR:  The context yes, but there is

7    a few questions here that I don't understand.

8        THE COURT:  I see.  So you understand everything

9    that I'm saying, but you are also looking forward to the

10   questionnaire?

11       PROSPECTIVE JUROR:  I don't understand.

12       THE COURT:  And on the second page of that there

13   are questions being asked that in reading it you don't

14   understand those questions?

15       PROSPECTIVE JUROR:  Yes.

16       THE COURT:  Okay.  Counsel, any questions?

17       MR. BRACKLEY:  No.

18       MS. CHAO:  No, your Honor.

19       THE COURT:  All right.  Do you each consent?

20       MS. CHAO:  Yes.

21       MR. BRACKLEY:  Yes.

22       THE COURT:  Sir, I will excuse you.

23            (Whereupon, the following takes place in open

24   court.)

25       THE COURT CLERK:  Juror number 12, Manjinder

1    Singh.  Last name S-I-N-G-H.  First name, M-A-N-J-I-N-D-E-R.

2            THE COURT:  Good morning, Mr. Singh.

3            Mr. Singh, just to bring you up to where I am with

4    the other jurors, I will ask you the same questions I have

5    asked them and those questions include, sir, are you over 18

6    years old and a resident of Queens County and a citizen of

7    this country?

8            PROSPECTIVE JUROR:  Yes.

9            THE COURT:  Have you ever been convicted of a

10    felony?

11           PROSPECTIVE JUROR:  No.

12           THE COURT:  Are you able to read, understand and

13    speak English?

14           PROSPECTIVE JUROR:  Yes.

15           THE COURT:  Back to the entire panel, do either of

16    you know me, the ADA, defendant, Defense Counsel or to your

17    knowledge any of our family or friends?

18           (Whereupon, the prospective jurors respond no.)

19           THE COURT:  Now, there's a number of people that

20    may testify in this trial whose names include, Corinthian

21    Brown, Anthony less Englesbobb, Perickles Vasilaropoulos.

22    V-A-S-I-L-A-R-O-P-O-U-L-O-S.  Do either of you know anyone

23    by that name?

24           (Whereupon, the prospective jurors respond no. )

25           THE COURT:  Other names include, Joseph Faivus,

Voir Dire

1    Detective Ronald Stanulis, Police Officer Greg Leavey,

2    Natalya Yanoff, Nagy Beckhit, B-E-K-H-I-T, Sylvia Babilonia,

3    and a Kenny Belezaire do any of you know anyone by those

4    names?

5                    (Whereupon, the prospective jurors respond no. )

6                    THE COURT:  This case we fully expect -- this

7    trial will not be in session tomorrow.  So you will not have

8    to be here tomorrow.  This case should be over at latest by

9    Tuesday, August 4th.  That.

10                   Said, do either of you have any hearing handicap

11   or other handicap or disability that would prevent you from

12   sitting as a juror through the latest August 4th?

13                   (Whereupon, the prospective jurors respond no.)

14                   THE COURT:  Miss Jaramillo?

15                   PROSPECTIVE JUROR:  I'm not going to be here on

16   the 3rd, in the country.

17                   THE COURT:  You have tickets, you have plans, you

18   are literally leaving the country on the 3rd?

19                   PROSPECTIVE JUROR:  Yes.

20                   THE COURT:  Counsel, consent?

21                   MS. CHAO:  Yes.

22                   MR. BRACKLEY:  Yes.

23                   THE COURT:  Thank you, ma'am.  Have a nice trip.

24                   THE COURT CLERK:  Juror number 10, last name

25   S-H-I-S-L-E-R.  First name, Anne.  A-N-N-E.

Voir Dire

```
 1                    THE COURT:  Good morning, Miss Shisler.  Same
 2        questions I asked everyone else, again just to bring you up
 3        to where I am with the others, ma'am, you are over 18 years
 4        old, resident of Queens County, citizen of this country?
 5                    PROSPECTIVE JUROR:  Yes.
 6                    THE COURT:  Ever been convicted of a felony?
 7                    PROSPECTIVE JUROR:  No.
 8                    THE COURT:  Read, understand, speak English?
 9                    PROSPECTIVE JUROR:  Yes.
10                    THE COURT:  Do you know me, ADA, defendant,
11        Defense Counsel or to your knowledge any of our family or
12        friends?
13                    PROSPECTIVE JUROR:  No.
14                    THE COURT:  You heard me read from a list of
15        people who may testify in this trial, do you know anyone by
16        those names?
17                    PROSPECTIVE JUROR:  No.
18                    THE COURT:  Do you have any hearing handicap or
19        other type of handicap or disability that would prevent from
20        you sitting as a juror through the latest August 4th?
21                    PROSPECTIVE JUROR:  No.
22                    THE COURT:  Back to the entire panel.
23                    Do either of you have and extreme hardship or
24        other pressing matter that would prevent you from giving
25        your full attention through the end of this trial?
```

 1              (Whereupon, the jurors respond no. )

 2              THE COURT:  I will note that when I had asked --

 3     last asked the question of the entire panel, the volume of

 4     your answer was higher.  So again, with every question,

 5     please keep your voices up.

 6              Do either of you have any religious or moral or

 7     ethical beliefs or reasons that would prevent you from

 8     finding a person guilty if that guilt were prove to you

 9     beyond a reasonable doubt?

10              (Whereupon, the prospective jurors respond no. )

11              THE COURT:  You may know, if you don't, you do

12     know now that any person who is arrested and charged with a

13     crime in this country they have a right not to testify at

14     trial and as I sit here now I don't know whether or not the

15     defendant will testify in this trial.  I'm letting you know

16     that he has a right not to.

17              With that said, the law further is that a jury may

18     not hold that against a defendant if he chooses not to

19     testify.

20              My question, if the defendant chooses not to

21     testify, would you be able to follow my instructions and not

22     draw any inference unfavorable to him simply because he

23     chooses not to testify?

24              (A Whereupon, the prospective jurors respond yes.)

25              THE COURT:  Mr. Hoffman?

1        PROSPECTIVE JUROR:  I said yes.

2        THE COURT:  I didn't hear your answer.  This crime

3    is alleged to have taken place at 4:30 in the morning at a

4    White Castle restaurant, 21-02 on Broadway, I believe in

5    Astoria.  Do either of you know that restaurant?

6        All right.  For those of you who know the

7    restaurant, in the course of this trial -- which of you know

8    the restaurant?

9        Mr. Hoffman, Miss Williams, Mr. Weinstein and

10   Miss DeRosa, in the course of this trial, if you are chosen

11   as a juror, would you be able to avoid going into that White

12   Castle restaurant?

13       (A Whereupon, the prospective jurors respond yes.)

14       THE COURT:  Is there anything about the nature of

15   the crime charged, obviously as you heard the defendant is

16   charged with robbery, he's charged with using what appeared

17   to be a gun, is there anything -- and assault, is there

18   anything about the nature of the crime charged that makes

19   you feel that you could not give both sides a fair trial in

20   this case?

21       (Whereupon, the prospective jurors respond no. )

22       THE COURT:  Now, to the questionnaire and

23   beginning with Miss Williams, I will read through each

24   question with her and get her answer and then beginning with

25   Mr. Marin simply read the question number and get his

Voir Dire

1       answer.

2                    So Miss Williams, number 1, please, your name?

3                    PROSPECTIVE JUROR:  Tamara Williams.

4                    THE COURT:  Place of birth?

5                    PROSPECTIVE JUROR:  Brooklyn New York.

6                    THE COURT:  Area of residence?

7                    PROSPECTIVE JUROR:  Queens.

8                    THE COURT:  Where in Queens?

9                    PROSPECTIVE JUROR:  Jamaica.

10                   THE COURT:  4.  How long have you lived at the

11      current address?

12                   PROSPECTIVE JUROR:  Two years.

13                   THE COURT:  Number 5.  How long have you lived in

14      this country?

15                   PROSPECTIVE JUROR:  All my life.

16                   THE COURT:  6.  What is your marital status?

17                   PROSPECTIVE JUROR:  Single.

18                   THE COURT:  7.  Years of education or your highest

19      degree?

20                   PROSPECTIVE JUROR:  Certificate.

21                   THE COURT:  From what?

22                   PROSPECTIVE JUROR:  Medical office.  A vocational

23      school.

24                   THE COURT:  Number 8.  What is your occupation?

25                   PROSPECTIVE JUROR:  I'm a student.  Unemployed.

Voir Dire

```
 1                    THE COURT:  Are you a student full-time or
 2       part-time?
 3                    PROSPECTIVE JUROR:  Full-time.
 4                    THE COURT:  What is your major course of study?
 5                    PROSPECTIVE JUROR:  Health Science.
 6                    THE COURT:  What level are you, freshman,
 7       sophomore?
 8                    PROSPECTIVE JUROR:  Sophomore.
 9                    THE COURT:  Are you working part-time?
10                    PROSPECTIVE JUROR:  No.
11                    THE COURT:  What was the last full-time employment
12       that had you?
13                    PROSPECTIVE JUROR:  I was a rehabilitation
14       specialist for mentally developed adults.
15                    THE COURT:  When you were doing that kind of work
16       how long had you done that kind of work?
17                    PROSPECTIVE JUROR:  About 10, 11 months.
18                    THE COURT:  Number 9.  Have you ever served on a
19       State or Federal grand jury?
20                    PROSPECTIVE JUROR:  No.
21                    THE COURT:  10.  Have you ever served on a State
22       or Federal trial jury?
23                    PROSPECTIVE JUROR:  No.
24                    THE COURT:  11A.  Have you, any relative or close
25       friend been the victim of a crime?
```

1          PROSPECTIVE JUROR:  Yes.  My cousin.  She was

2    robbed.

3          THE COURT:  Robbed how?

4          PROSPECTIVE JUROR:  Well, I guess he walked up to

5    her with a demanded, told her to give him her cell phone and

6    her purse and he took those two items, her purse and her

7    cell phone.

8          THE COURT:  That person, your cousin, did not know

9    him?

10          PROSPECTIVE JUROR:  No.

11          THE COURT:  Was he ever caught and charged with

12    that crime?

13          PROSPECTIVE JUROR:  Yes.

14          THE COURT:  Any idea as to how he was caught?

15          PROSPECTIVE JUROR:  He was robbing somebody else

16    in the same neighborhood and I believe that the lady went to

17    the precinct at the time when the detective was out looking

18    for him with my cousin and that's how he found him.

19          THE COURT:  Did he still -- did he still have with

20    him --

21          PROSPECTIVE JUROR:  The cell phone, yes, he did.

22          THE COURT:  Now, as you've heard, this defendant

23    is charged with a robbery.  We need to though whether or not

24    you will be able to put that incident with your cousin as a

25    victim aside and give each side in this case a fair trial?

Voir Dire

```
 1                    PROSPECTIVE JUROR:  Yes, I will.

 2                    THE COURT:  Any other answer to 11A, victim of a

 3          crime?

 4                    PROSPECTIVE JUROR:  Well, yes.  My best friend was

 5          murdered about two years ago and that's it.

 6                    THE COURT:  Murdered how?

 7                    PROSPECTIVE JUROR:  Well, we are not really sure.

 8          It's kind of still open.  She was missing.  I believe that

 9          she was murdered because they did find some blood within the

10          area that she was supposed to be, so we believe so, but it's

11          kind of still open.

12                    THE COURT:  Are you saying that she hasn't been

13          found?

14                    PROSPECTIVE JUROR:  No.  No.

15                    THE COURT:  Anything about that crime that makes

16          you feel you could not be fair to both sides in this case?

17                    PROSPECTIVE JUROR:  No.

18                    THE COURT:  Any other answer to 11A?

19                    PROSPECTIVE JUROR:  No.

20                    THE COURT:  Same answer to 11B, witness to a

21          crime, any other answer to 11B?

22                    PROSPECTIVE JUROR:  No.

23                    THE COURT:  11C.  Have you any relative or close

24          friends been accused of a crime?

25                    PROSPECTIVE JUROR:  No.
```

1          THE COURT:   11D.  You, any relative or close

2     friend been convicted of a crime?

3          PROSPECTIVE JUROR:  No.

4          THE COURT:   11E.  Have you, any relative of close

5     friend testified in a criminal proceeding?

6          PROSPECTIVE JUROR:  No.

7          THE COURT:  And 11F, have you any relative or

8     close friend been a party to a civil lawsuit?

9          PROSPECTIVE JUROR:  No.

10          THE COURT:   12A, have you, any relative or close

11     friends been employed by a law enforcement agency or

12     criminal justice agency?

13          PROSPECTIVE JUROR:  No.

14          THE COURT:   12B, have you, any relative or close

15     friend been employed by a law firm?

16          PROSPECTIVE JUROR:  No.

17          THE COURT:   12C, have you, any relative or close

18     friend had any legal training?

19          PROSPECTIVE JUROR:  No.

20          THE COURT:   11B, have you any relative or close

21     friend worked on behalf of a defendant?

22          PROSPECTIVE JUROR:  No.

23          THE COURT:   13.  You or any one close to you had

24     such a pleasant or such an unpleasant experience with the

25     police that you feel you could not be a fair and impartial

1      juror?

2                  PROSPECTIVE JUROR:  No.

3                  THE COURT:  Law says an indictment is only an

4      accusation of a crime.  You cannot infer that a defendant is

5      guilty because he has been arrested and because he has been

6      indicted by a grand jury.  Can you accept that concept and

7      will you follow the law that I will later present to you?

8                  PROSPECTIVE JUROR:  Yes.

9                  THE COURT:  15.  Law says that the defendant is

10     presumed innocent until prove guilty beyond a reasonable

11     doubt, can you accept that and will you follow the law that

12     I will later present to you?

13                 PROSPECTIVE JUROR:  Yes.

14                 THE COURT:  14.  Do you understand that because

15     you have heard no evidence up to this point and if you were

16     asked to vote right now you would have to vote that this

17     defendant is not guilty?

18                 PROSPECTIVE JUROR:  Yes.

19                 THE COURT:  17.  Law says that the prosecution has

20     the burden of proving the defendant guilty beyond a

21     reasonable doubt.  Can you accept that and will you follow

22     the law that I will later present to you?

23                 PROSPECTIVE JUROR:  Yes.

24                 THE COURT:  18.  Do you know any reason why you

25     cannot sit as a fair and impartial juror in this case?

Voir Dire

1              PROSPECTIVE JUROR:  No.

2              THE COURT:  Thank you, ma'am.

3              Mr. Marin number 1, please.

4              PROSPECTIVE JUROR:  Alberto Marin.

5              THE COURT:  2.

6              PROSPECTIVE JUROR:  Born in Columbia.

7              THE COURT:  3.

8              PROSPECTIVE JUROR:  Flushing.

9              THE COURT:  4.

10             PROSPECTIVE JUROR:  20 years.

11             THE COURT:  5.

12             PROSPECTIVE JUROR:  34 years.

13             THE COURT:  6.

14             PROSPECTIVE JUROR:  Married.

15             THE COURT:  7.

16             PROSPECTIVE JUROR:  College.

17             THE COURT:  BA, BS?

18             PROSPECTIVE JUROR:  I don't know the difference

19    between here and there.  It was in my country.

20             THE COURT:  In Columbia you had gone to college?

21             PROSPECTIVE JUROR:  Yes, sir.  I did like

22    engineer, but I just did two semesters then I came here.

23             THE COURT:  Number 8?

24             PROSPECTIVE JUROR:  My occupation I own my own

25    business.

Voir Dire

1          THE COURT:  What kind of business do you own?

2          PROSPECTIVE JUROR:  Pastry shop.

3          THE COURT:  How long have you owned that business?

4          PROSPECTIVE JUROR:  Right now, this, about 7

5      years.

6          THE COURT:  How many people do you employ in this

7      shop?

8          PROSPECTIVE JUROR:  Just four people.

9          THE COURT:  What kind of work does your wife do?

10         PROSPECTIVE JUROR:  I do everything.  The

11     business, everything.  I'm alone.

12         THE COURT:  Are you saying that your wife --

13         PROSPECTIVE JUROR:  I do like, you know, business

14     accounts.  I do a lot of things.  So I am really involved

15     with my business.

16         THE COURT:  My question is, what kind of work does

17     your wife do?

18         PROSPECTIVE JUROR:  She goes helps the front.

19         THE COURT:  Okay.  So your wife works in your

20     business with you?

21         PROSPECTIVE JUROR:  Yes, sir.

22         THE COURT:  Any children of working age?

23         PROSPECTIVE JUROR:  Yes, sir.  No, working age.

24     My son is 12 years old.

25         THE COURT:  Number 9?

Voir Dire

1              PROSPECTIVE JUROR:  No, sir.  10, no, sir.  11A

2      no, sir.  11B, no, sir.  11C, no, sir.  D, no, sir.  11E,

3      no, sir.  11F, no, sir.

4              THE COURT:  12A?

5              PROSPECTIVE JUROR:  What do you mean?  Excuse me,

6      I mean.  No, sir.

7              THE COURT:  12A?

8              PROSPECTIVE JUROR:  No, sir.

9              THE COURT:  12B, law firm?

10             PROSPECTIVE JUROR:  No, sir.

11             THE COURT:  12C?

12             PROSPECTIVE JUROR:  No, sir.

13             THE COURT:  12 D?

14             PROSPECTIVE JUROR:  No, sir.  13, no.

15             THE COURT:  14?

16             PROSPECTIVE JUROR:  I got little problem too

17     understanding.  Can you give me just one second, please?

18             (Whereupon, there is a brief pause in the

19     proceedings.)

20             PROSPECTIVE JUROR:  Yes, sir.

21             THE COURT:  15?

22             PROSPECTIVE JUROR:  Yes, sir.

23             THE COURT:  16?

24             (Whereupon, there is a brief pause in the

25     proceedings.)

Voir Dire

```
 1          THE COURT:  That's a concept question.  I'm trying
 2   to make sure that each of you understand that as the
 3   defendant is sitting here charged with this crime in this
 4   room, here he has been charged with a crime.  You haven't
 5   heard any evidence.
 6          PROSPECTIVE JUROR:  Not at all, sir.  No.  No.
 7          THE COURT:  So as you look at the defendant now,
 8   if you were asked to vote right now, you will not be asked
 9   to vote right now, but if you were asked to vote right now,
10   since he's only accused, you haven't heard any evidence, so
11   he's not guilty.
12          PROSPECTIVE JUROR:  He's not guilty until -- yes.
13   Yes.  I understand.
14          THE COURT:  Number 17?
15          PROSPECTIVE JUROR:  Yes, sir.
16          THE COURT:  And number 18?
17          PROSPECTIVE JUROR:  No, sir.
18          THE COURT:  Thank you, sir.
19          Miss Lee, number 1, please?
20          PROSPECTIVE JUROR:  Cleo Lee.  Hong Kong.  Rego
21   Park.  4, years.  5, 37 years.  6, single.  7, BA in Psyche.
22   8, director of retail operations for a cosmetic company.
23          THE COURT:  You have been working with them for
24   how long now?
25          PROSPECTIVE JUROR:  15 years.
```

Voir Dire

```
 1                    THE COURT:  What do you do for them as a director?

 2                    PROSPECTIVE JUROR:  I manage inventory, implement

 3       policy procedure.  I open new stores, renovate old stores.

 4                    THE COURT:  Everything?

 5                    PROSPECTIVE JUROR:  Operations, yes.

 6                    THE COURT:  How long have you been a director?

 7                    PROSPECTIVE JUROR:  About two years.

 8                    THE COURT:  And in that position, how many people

 9       do you supervise as you go through those operational needs

10       of the company?

11                    PROSPECTIVE JUROR:  About ten people.

12                    THE COURT:  Number 9?

13                    PROSPECTIVE JUROR:  No.  10, no.  11A, someone

14       stole my wallet on a plane.

15                    THE COURT:  Did it happen on the plane as opposed

16       to pre-boarding?

17                    THE WITNESS:  It happened on the plane.

18                    THE COURT:  When did you find the wallet missing?

19                    PROSPECTIVE JUROR:  I was using the lavatory.  I

20       came out, it was gone.

21                    THE COURT:  How did you handle it, meaning, you

22       know, did you call the flight attendant?

23                    PROSPECTIVE JUROR:  Yeah.  They searched the plane

24       and then they had the airline people meet me at the gate and

25       then I had to report it at the airport with their police.
```

1          THE COURT:  And did they do any kind of

2     investigation as far as asking any passengers if they had

3     seen it?

4          PROSPECTIVE JUROR:  The police, no.

5          THE COURT:  Attendants on the plane?

6          PROSPECTIVE JUROR:  They didn't ask anybody, they

7     just searched the plane.

8          THE COURT:  Okay.  While the wallet was stolen did

9     you ever get any part of it back?

10         PROSPECTIVE JUROR:  No.

11         THE COURT:  Or the contents?

12         PROSPECTIVE JUROR:  No.

13         THE COURT:  Anything about that that makes you

14    feel that you could not be fair to both sides in this case?

15         PROSPECTIVE JUROR:  No.

16         THE COURT:  Any other answer to 11A?

17         PROSPECTIVE JUROR:  No.

18         THE COURT:  Same answer to 11B.  Any other answer

19    to 11B?

20         PROSPECTIVE JUROR:  No.

21         THE COURT:  11C?

22         PROSPECTIVE JUROR:  No.  D, no.  E, I have a

23    friend who works for -- he's a criminalist for Queens

24    County, so he would have testified in criminal proceedings.

25         THE COURT:  What do you understand that friend

1    does as a criminalist?

2                PROSPECTIVE JUROR:  Some forensics.

3                THE COURT:  Okay.  You -- that friend you

4    understand actually works in Queens?

5                PROSPECTIVE JUROR:  Yes.

6                THE COURT:  In this case, there may be a witness

7    or two that may work with your friend, is there anything

8    about that that makes you feel that you couldn't be fair to

9    both sides in this case?

10               PROSPECTIVE JUROR:  No.  I just know of him.  I

11   don't know anything about his office or anything like that.

12               THE COURT:  Any other answer to 11E?

13               PROSPECTIVE JUROR:  No.  F, no.

14               THE COURT:  Other than that friend, any other

15   answer to 12A?

16               PROSPECTIVE JUROR:  I have a second cousin who is

17   a police officer in the Fifth Precinct.  I have my

18   brother-in-law is a cop in Glendale, and then the friend,

19   the criminologist.

20               THE COURT:  12B?

21               PROSPECTIVE JUROR:  No.  C, no.  D, no.

22               THE COURT:  Number 13?

23               PROSPECTIVE JUROR:  No.

24               THE COURT:  Number 14?

25               PROSPECTIVE JUROR:  Yes.

Voir Dire

1          THE COURT:   15?

2          PROSPECTIVE JUROR:   Yes.

3          THE COURT:   16?

4          PROSPECTIVE JUROR:   Yes.

5          THE COURT:   17?

6          PROSPECTIVE JUROR:   Yes.   18, no.

7          THE COURT:   Thank you.   Mr. Hoffman number 1,

8     please.

9          PROSPECTIVE JUROR:   Mark Hoffman.   2, Bronx,

10    New York.   3, Jackson Heights.   4, 33 years.   5, 57 years.

11    6, married.   7, I have two masters degrees and some post

12    masters work.   One is in literature.   One is in educational

13    psychology.   Working towards a Ph.D. in literature.   Number

14    8, college professor.

15         THE COURT:   What subject or subjects do you teach?

16         PROSPECTIVE JUROR:   English and what's called

17    developmental skills remedial reading, writing, and I teach

18    literature as well.   I work full-time.   I also teach as an

19    adjunct elsewhere.

20         THE COURT:   What kind of work does your wife do?

21         PROSPECTIVE JUROR:   She's currently unemployed,

22    but she is a Human Resources manager.

23         THE COURT:   When she was last working what kind of

24    company did she work with?

25         PROSPECTIVE JUROR:   Clothing manufacturer.

Voir Dire

```
1              THE COURT:  Any children of working age?

2              PROSPECTIVE JUROR:  I have one son who is studying

3     now, a student.

4              THE COURT:  Number 9?

5              PROSPECTIVE JUROR:  No.  10, no.  11A, yes.

6              THE COURT:  Who and what kind of crime?

7              PROSPECTIVE JUROR:  Breaking into a vacation home

8     that we own, minor disturbance.

9              THE COURT:  Anyone home at the time?

10             PROSPECTIVE JUROR:  No.

11             THE COURT:  How did you learn of the break-in?

12             PROSPECTIVE JUROR:  There was apparent signs of a

13    break in.  Nothing of value in the house, but there was -- I

14    don't mean to be funny, but there were gorilla bars stolen.

15             THE COURT:  At the time that happened how long had

16    you owned that home?

17             PROSPECTIVE JUROR:  16 years.

18             THE COURT:  Since that happened any further

19    break-in's of this home?

20             PROSPECTIVE JUROR:  No.

21             THE COURT:  Any other answer to 11A?

22             PROSPECTIVE JUROR:  No.

23             THE COURT:  11B?

24             PROSPECTIVE JUROR:  No.  C, no.  D, no.  E, no, F,

25    no.
```

1    THE COURT:   12A?

2    PROSPECTIVE JUROR:   Yes.  I have a few friends

3    that are lawyers, a friend that is chief clerk in the Bronx

4    court.

5    THE COURT:   So the friend would probably more of

6    an answer to 12A and the other answer would be more of an

7    answer to 12B.

8    PROSPECTIVE JUROR:   Yes.  Sorry.

9    THE COURT:   You said that the friend, the clerk,

10   what court does that --

11   PROSPECTIVE JUROR:   Bronx.

12   THE COURT:   Civil or criminal?

13   PROSPECTIVE JUROR:   Criminal.

14   THE COURT:   Any other answer to 12A?

15   PROSPECTIVE JUROR:   No.

16   THE COURT:   As far as 12B is concerned and the

17   number of lawyer friends you have, what kind of law do they

18   practice, if you know?

19   PROSPECTIVE JUROR:   One works for the District

20   Attorney's office in Manhattan, one does civil, one does

21   general.

22   THE COURT:   The friend that works for the District

23   Attorney in Manhattan, do you know whether or not that

24   friend is a trial Counsel or Appeals or what division of the

25   office --

49

Voir Dire

1          PROSPECTIVE JUROR:   I don't know right now.

2          THE COURT:   Any other answer to 12B?

3          PROSPECTIVE JUROR:   No.

4          THE COURT:   Same answer to 12C.  Any other answer

5    to 12C?

6          PROSPECTIVE JUROR:   No.

7          THE COURT:   Maybe one or two would be an answer to

8    12B, any other answer to 12B?

9          PROSPECTIVE JUROR:   No.

10          THE COURT:   Number 13?

11          PROSPECTIVE JUROR:   No.

12          THE COURT:   14?

13          PROSPECTIVE JUROR:   Yes.  15, yes.  16, yes 17,

14    yes.  18, no.

15          THE COURT:   Thank you, sir.

16          Miss Wilson number 1, please.

17          PROSPECTIVE JUROR:   Yes.  Lisa Wilson.  2, New

18    York City.  3, Fresh Meadows, Queens.  4, about 20 years.

19          THE COURT:   5?

20          PROSPECTIVE JUROR:   All my life.  6, single.  7,

21    12th grade plus about six years of college.  I don't have

22    the degree.

23          THE COURT:   As you had gone through those years in

24    college was there a major that you focused on?

25          PROSPECTIVE JUROR:   Business Administration.  8, I

lyc

1    work for Human Resources Administration.  Right now I'm an

2    administrative assistant.

3              THE COURT:  You have been working with them for

4    how long now?

5              PROSPECTIVE JUROR:  20 years.

6              THE COURT:  Any children of working age?

7              PROSPECTIVE JUROR:  No.

8              THE COURT:  Number 9?

9              PROSPECTIVE JUROR:  I think so.  I think yes.

10             THE COURT:  State or Federal?

11             PROSPECTIVE JUROR:  I think State.

12             THE COURT:  At the time that you may have served

13   on a grand jury was it here in Queens County?

14             PROSPECTIVE JUROR:  No, the Bronx.

15             THE COURT:  When you served there were you in a

16   room hearing evidence of a number of cases, pieces of --

17   parts of a number of cases?

18             PROSPECTIVE JUROR:  Like this.  It was like this.

19             THE COURT:  Like this?

20             PROSPECTIVE JUROR:  Yes.

21             THE COURT:  Well, like this would be more of a

22   trial jury in which there was someone charged with a crime,

23   there was a prosecutor and defense attorney --

24             PROSPECTIVE JUROR:  No.  No, crime.  It was a

25   lawsuit for an accident.

Voir Dire

```
 1          THE COURT:  Okay.  So it was a civil case?
 2          PROSPECTIVE JUROR:  Yes.
 3          THE COURT:  So you may have served on a grand
 4    jury, but certainly number 10A you had served on a civil
 5    jury?
 6          PROSPECTIVE JUROR:  Yes.
 7          THE COURT:  10B?
 8          PROSPECTIVE JUROR:  Yes.
 9          THE COURT:  10C?
10          PROSPECTIVE JUROR:  Oh, I don't remember.  It's
11    been a long time now.
12          THE COURT:  11A, victim of a crime?
13          PROSPECTIVE JUROR:  Yes.
14          THE COURT:  Who and what kind of crime?
15          PROSPECTIVE JUROR:  Me and my sister.  My sister
16    was robbed at knife point while she was pregnant and we
17    tried to chase after him.
18          THE COURT:  Anyone caught and charged with the
19    crime?
20          PROSPECTIVE JUROR:  No.
21          THE COURT:  How old was she at the time?
22          PROSPECTIVE JUROR:  19, 20.
23          THE COURT:  Was she or the baby hurt in any way?
24          PROSPECTIVE JUROR:  No.
25          THE COURT:  You said that we chased after him, it
```

1    was you and --

2              PROSPECTIVE JUROR:  And some other people that was

3    there around at the time.

4              THE COURT:  Were you able to see the knife that

5    was used against your sister?

6              PROSPECTIVE JUROR:  Yes.

7              THE COURT:  That obviously, as you know, is a

8    robbery.  This defendant is charged with a robbery although

9    certainly not the same circumstances.  We need to know

10   whether or not you will be able to put out of your mind what

11   you had witnessed and gone through with your sister and give

12   each side in this case a fair trial?

13             PROSPECTIVE JUROR:  I'm not sure.

14             THE COURT:  Okay.  We need that certainty from you

15   that you can be sure.  Counsel, consent?

16             MR. BRACKLEY:  Yes.

17             MS. CHAO:  Yes.

18             THE COURT:  Ma'am, I'll excuse you and recommend

19   civil cases for you.  Thank you.

20             THE COURT CLERK:  Juror number 5, Angel Avila.

21             THE COURT:  Moving forward and now, Mr. Weinstein.

22   Mr. Weinstein, number 1, please.

23             PROSPECTIVE JUROR:  Eric Weinstein.  2, Bellmore,

24   Long Island.  3, Maspeth.  4, six years.  5, all my life.

25   6, married.  7, bachelors in accounting.  8, accountant.

Voir Dire

1          THE COURT:  For what kind of company do you work?

2          PROSPECTIVE JUROR:  Small accounting company that

3     does retail gas station.

4          THE COURT:  For how long?

5          PROSPECTIVE JUROR:  Seven years.

6          THE COURT:  What kind of work does your wife do?

7          PROSPECTIVE JUROR:  She's a teacher for the New

8     York City Board of Ed for the deaf and hard of hearing.

9          THE COURT:  Working with that type of student, is

10    there an age range?

11         PROSPECTIVE JUROR:  She goes from elementary to

12    high school.

13         THE COURT:  Number 9?

14         PROSPECTIVE JUROR:  No.

15         THE COURT:  10?

16         PROSPECTIVE JUROR:  No.

17         THE COURT:  11A?

18         PROSPECTIVE JUROR:  Sorry.  Sorry.

19         THE COURT:  Number 9?

20         PROSPECTIVE JUROR:  No.

21         THE COURT:  10?

22         PROSPECTIVE JUROR:  No.

23         THE COURT:  11A?

24         PROSPECTIVE JUROR:  8 yes.

25         THE COURT:  Who and what kind of crime?

Voir Dire

1    PROSPECTIVE JUROR:  My father was in the

2    distributing business for 30 years.  He got held up at

3    gunpoint numerous times.  Thank God nothing really happened,

4    but that's a major set back.

5    THE COURT:  This is your father and he had what

6    kind of business?

7    PROSPECTIVE JUROR:  A bread and cake distributor.

8    THE COURT:  You said robbed at gunpoint numerous

9    times?

10   PROSPECTIVE JUROR:  Gunpoint numerous times, with

11   a knife also.

12   THE COURT:  We need to know whether or not you

13   will be able to set those tragic incidents that your father

14   had gone through aside, knowing what the charges are in this

15   case and be fair to both sides in this case?

16   PROSPECTIVE JUROR:  No, I can't.

17   THE COURT:  Consent?

18   MS. CHAO:  Yes.

19   MR. BRACKLEY:  Yes.

20   THE COURT CLERK:  Juror number 6, Scott Meyer.

21   M-E-Y-E-R.  First name.  S-C-O-T-T.

22   THE COURT:  Moving forward, Miss Perbeen number 1,

23   please.

24   PROSPECTIVE JUROR:  Bangladesh.

25   THE COURT:  Number 1 is your name.